SYBIL LINDSEY DANIELS, Plaintiff v. METRO MAGAZINE HOLDING COMPANY,
L.L.C. and BERNIE REEVES, Defendants

No. COA05-1336

(Filed 19 September 2006)

**Libel and Slander— magazine article—opinion and hyperbole**

The trial court properly dismissed an insurance adjuster's
claim for libel and related claims for intentional infliction of emo-
tional distress and unfair or deceptive trade practices against the
editor and publisher of a magazine who published an article
about his unhappy experience after his car was stolen. Because
defendant's statements are either expressions of pure opinion not
capable of being proven or rhetorical hyperbole which no rea-
sonable reader would believe, the statements are constitutionally
protected and the court properly dismissed plaintiff's complaint.

Appeal by plaintiff from an order entered 7 July 2005 by Judge
Donald W. Stephens in Wake County Superior Court. Heard in the
Court of Appeals 14 August 2006.

*Kennedy, Kennedy, Kennedy & Kennedy, LLP, by Harvey L.
Kennedy and Harold L. Kennedy, III, for plaintiff-appellant.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P.,
by William H. Moss, for defendant-appellees.*

DANIELS v. METRO MAGAZINE HOLDING CO., L.L.C.

[179 N.C. App. 533 (2006)]

MARTIN, Chief Judge.

Sybil Lindsey Daniels ("plaintiff") filed a complaint against defendants in Wake County Superior Court setting forth claims of libel, intentional infliction of emotional distress, and unfair or deceptive practices. As grounds for her complaint, plaintiff alleged that Reeves, the editor and publisher of Metro Magazine ("Metro"), had written and published an article in which he defamed plaintiff in her profession as an insurance adjuster for Progressive Insurance Company ("Progressive"). The article appeared in the November 2003 issue of Metro under an editorial column entitled "My Usual Charming Self." The specific essay, "DRIVIN' ALONG IN MY AUTOMOBILE," reads in pertinent part as follows:

> The theft of my automobile didn't make the headlines. I guess the Michael Peterson and Meg Scott Phipps trials were deemed more important. And face it, car thefts and home burglaries are a [sic] commonplace, even in allegedly low crime zones like Raleigh. But I feel that what happened to me is worthy of making the permanent record based on the similar experiences shared by friends and associates. It seems many of us have been victims of the crime no one wants to do something about.

> On Labor Day Sunday morning, I walked out of my side door with keys in hand to discover a blank space where my car had been the night before, not 10 feet away from the guest room that was actually occupied with guests. No one heard anything, including my two Chinese Chow-Chows who usually burst into a barking frenzy when the postman stops two blocks away.

> I called the police, who arrived promptly. I told the officer I had satellite auto location capability so we should be able to track down the car in an hour or so. He said he would call OnStar and report the theft while showing me the onboard computer in the squad car with all my pertinent data displayed. He said not to worry, we'll find it.

> A few hours later there was no word from RPD or OnStar, so I called the number on the card the officer gave me, naively thinking it was his direct cell phone line. Instead I was disappointed to reach the main number for police dispatch. I asked to speak to my case officer and was told, "I've got 400 names here and they're single-spaced and not alphabetized and I can't find the officer's name."

DANIELS v. METRO MAGAZINE HOLDING CO., L.L.C.

[179 N.C. App. 533 (2006)]

With this unforeseen setback in mind, the next morning, Labor Day, I called OnStar myself only to discover they had never been called by RPD to report the theft. I gave them the case number and headed out about my business and called the house an hour or two later to ask my wife Katie if she had heard anything.

Yes, she said, they have found your car. Before I could celebrate she added: "The police got into a high-speed chase and the car hit a pole (I'm thinking, not good news but still, they have the car) and . . . pause . . . the engine caught on fire." This was not good news indeed. The car was basically new and I'm thinking it will never have the same value and I'm screwed—until it hit me it must be a total loss and I began ruminating about the choices before me: Do I replace it with the same model car or do I want to change to something else . . . mmmhh, maybe this will work out to my advantage.

Until I talked to Sybil, the claims adjustor with Progressive Insurance. She called me responding to a message I left with my local agent and her local office the moment the car was stolen on Sunday morning. No one was available then, but on Monday Sybil was back in the saddle and in rare form. After accusing me of stealing my own car—she actually did—Sybil lapsed into bureaucratic order-giving that would put former Soviet security police to shame. She announced she was switching on her tape recorder with a tone that suggested she was on to me and the tape would tell the tale. I capitulated to the interrogation after some resistance and answered the questions. After that, she explained that she was sending me an affidavit to fill out and have notarized. "Notarized?" I said. In her calm, sinister voice she said yes and added: "I am enclosing in the package an envelope. You are to enclose all keys you have to your vehicle and return them with the notarized affidavit."

In effect, I screamed at Sybil—you are taking my car from me. In that quiet Gestapo voice, she let me know that there would be an investigation, again hinting that I had stolen my own car. Right about here in the story my agent returned to town and prevented Sybil from taking me to the gas chamber and things settled down until the next day when Sybil announced that the car was not a total loss.

By this time, late Tuesday, Sybil had seen the car but had forbade me from viewing the patient. The next day I was allowed to

visit the injured automobile in a junkyard in Southeast Raleigh hidden behind truck depots I never knew existed. As daylight was fading, I accelerated out of primal fear down the South Blount Street Connector and fortunately located what can only be described as Purgatory for deceased cars whose souls had passed into automobile heaven leaving behind their mortal coils of twisted steel, tires akimbo, their headlights dark.

The Jim Croce song about Superman popped in my head as Katie and I tiptoed around two junkyard dogs with pit bull features into the office trailer populated by what looked like bounty hunters and found out where my car was located in the vast graveyard of contorted metal corpses.

"Looks totaled to me," I said peering at the crushed right front and the fire damaged engine area.

After our escape in the gloaming I called Sybil and said, "How in the name of all that's holy could you say this car is repairable?" I'll spare you the details of her response but basically Progressive Insurance wasn't about to pay to replace a new car and that was that.

SOVEREIGN IMMUNITY

After more innuendos from Sybil that I had stolen my own car, Progressive went on with the repairs at my choice of shops (I didn't trust their offer to have it done at one of their "network" repair centers, for obvious reasons). To his credit, my agent ran down the headman for Progressive in North Carolina to complain about Sybil but the guy turned out to be a caricature of the glad-handing PR flak that feels your pain and keeps right on sticking it to you. Then I found out that my rental-car allowance in the policy was good for one week. This was getting expensive as well as annoying and time-consuming and I wanted to blame someone besides me and the thief, whom I would never meet and for sure wouldn't have insurance of his own.

So I called the Raleigh City Manager, the man in charge of the police department, to report that this harrowing series of events would not have happened if the police officer that took the initial theft report had done what he said he would do and call OnStar. I also communicated my disbelief that the dispatcher could not locate the officer when I called to verify he had called OnStar. Worse however, was the high-speed chase by the RPD that caused

**DANIELS v. METRO MAGAZINE HOLDING CO., L.L.C.**

[179 N.C. App. 533 (2006)]

the wreck. I had actually tracked down the other officers involved (it took two weeks) and they basically said they spotted the car after the report from OnStar (the one I called in, by the way) and engaged in a chase that caused a collision and yes, the engine did catch on fire.

The City Manager was nice enough but did not see that the RPD had caused my woes, stating that their actions are protected by the doctrine of "sovereign immunity" so tough luck. And tough luck it has been. At this writing my car is not ready two months after the incident. The repair shop keeps towing it hither and yon to replace this and that, indicating to me that it is never going to be right to drive. I can't receive a "depreciated value" payment, as the thief has to have his own insurance for that to happen. I have made payments on the car without being able to drive it and I've incurred costs driving a replacement and using Katie's leased vehicle for out of town trips. This is eating up her mileage allowance, creating an overage that will have to be paid when the lease is up.

As you find out when disasters strike, many others have suffered the same thing. But that is little solace when it happens to you. But there are bright spots. The Wake County District Attorney's office sent out a Victim's Information Report so I could track the process from arrest to, in this case, conviction. They take down personal property losses and include them as required payments from any funds collected from the thief from work relief.

And I confess, I had hidden a spare key in the console of the unlocked car. But I ask you, don't you feel awkward locking your car 10 feet from the door? There are other lessons here as well. Although crime is down, we still live in an unsafe world. And police today are, as the Captain of the Pinafore puts it, "exceedingly polite," I suppose from the pressure to be politically correct. But are good manners and a winning smile fighting crime? I prefer to think what happened to me is an exception when it comes to the police. But what is not an exception is the frightening attitude by Progressive Insurance. We have as much to fear from the corporate world as we do from government agencies. Insurance companies, cell phone providers, credit card providers . . . this is the new fascism that threatens the well-being and sense of security and well-being in our society.

And for those of you with OnStar, ask yourselves this? [sic] Wouldn't you call the police before calling OnStar? After all, you can't track down the thieves. Let my experience help. Be sure to call OnStar no matter what the police tell you.

As for the dogs, I forgave them . . . they usually sleep in the guest room.

. . . .

Plaintiff contended the essay maligned her in her profession and "g[ave] the impression that [she was] unethical, unprofessional, unscrupulous, an extremist and a communist."

Defendants moved to dismiss plaintiff's complaint pursuant to G.S. § 1A-1, Rule 12(b)(6). The trial court granted defendants' motion and dismissed plaintiff's claim with prejudice. Plaintiff appeals. We affirm the order of dismissal.

"The function of a motion to dismiss under Rule 12(b)(6) is to test the law of a claim and not the facts which support the claim." *Renwick v. News and Observer and Renwick v. Greensboro News*, 310 N.C. 312, 315, 312 S.E.2d 405, 408, *cert. denied*, 469 U.S. 858, 83 L. Ed. 2d 121 (1984). In testing the sufficiency of the complaint, all of the plaintiff's allegations are taken as true. *Id.* "A claim for relief should not be dismissed unless it affirmatively appears that the plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim." *Id.* Dismissal is proper, however, "when on its face the complaint reveals either no law supports the plaintiff's claim or the absence of fact sufficient to make a good claim, or when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Andrews v. Elliot*, 109 N.C. App. 271, 274, 426 S.E.2d 430, 432 (1993).

Plaintiff's first claim against defendants is that of libel. North Carolina law recognizes three classes of libel:

(1) publications obviously defamatory which are called libel *per se*; (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels *per quod*.

*Renwick*, 310 N.C. at 316, 312 S.E.2d at 408 (quoting *Arnold v. Sharpe*, 296 N.C. 533, 537, 251 S.E.2d 452, 455 (1979)). "To be action-

able, a defamatory statement must be false and must be communicated to a person or persons other than the person defamed." *Andrews*, 109 N.C. App. at 274, 426 S.E.2d at 432.

There are, moreover, "constitutional limits on the *type* of speech" subject to a defamation action. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16, 111 L. Ed. 2d 1, 16 (1990). If a statement "cannot 'reasonably [be] interpreted as stating actual facts' about an individual[,]" it cannot be the subject of a defamation suit. *Id.* at 20, 111 L. Ed. 2d at 19 (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50, 99 L. Ed. 2d 41, 48 (1988)); *see also Gaunt v. Pittaway*, 135 N.C. App. 442, 448, 520 S.E.2d 603, 608 (1999) (citing *Milkovich* for the proposition that statements of opinion relating to matters of public concern which do not contain provable false connotations are constitutionally protected). Rhetorical hyperbole and expressions of opinion not asserting provable facts are protected speech. *Milkovich*, 497 U.S. at 20, 111 L. Ed. 2d at 19. Although the *Milkovich* Court explicitly declined to provide a "wholesale defamation exemption [from liability] for anything that might be labeled 'opinion,' " it emphasized that a statement must state or imply a defamatory fact to be actionable. *Id.* at 18, 111 L. Ed. 2d at 17. Although someone cannot preface an otherwise defamatory statement with "in my opinion" and claim immunity from liability, a pure expression of opinion is protected because it fails to assert actual fact. Rhetorical hyperbole, in contrast, might appear to make an assertion, but a reasonable reader or listener would not construe that assertion seriously. For instance, in *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 26 L. Ed. 2d 6 (1970), a local newspaper published certain articles characterizing a real estate developer's negotiation position as "blackmail." The Supreme Court stated that a reader of the article would recognize that the word "was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id.* at 14, 26 L. Ed. 2d at 15. Protection for this type of speech, the *Milkovich* Court explained, "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20, 111 L. Ed. 2d at 19 (quoting *Falwell*, 485 U.S. at 53-55, 99 L. Ed. 2d at 48).

In determining whether a statement can be reasonably interpreted as stating actual facts about an individual, courts look to the circumstances in which the statement is made. *Milkovich*, 497 U.S. at 21, 111 L. Ed. 2d at 19; *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180,

184 (4th Cir. 1998). Specifically, we consider whether the language used is "loose, figurative, or hyperbolic language," as well as the "general tenor of the article." *Milkovich,* 497 U.S. at 21, 111 L. Ed. 2d at 19; *Biospherics,* 151 F.3d at 184.

In the instant case, plaintiff's complaint stated that defendants' article was libelous *per se.* In the alternative, plaintiff alleged that defendants' statements were susceptible of two interpretations. Plaintiff's complaint sets forth no claim for libel *per quod.* Plaintiff identified the following specific statements made by Reeves in his article as libelous:

1.) She (Sybil Lindsey Daniels) accused me (Bernie Reeves) of stealing my own car;

2.) Her actions were equivalent to the former Soviet security police;

3.) That putting her tape recorder on suggested that she was on to me;

4.) She spoke to me in a sinister voice;

5.) She hinted that I had stolen my own car;

6.) She spoke to me in a Gestapo voice;

7.) My agent prevented Sybil from taking me to the gas chamber;

8.) Sybil forbade me from seeing my car;

9.) Progressive wasn't about to pay to replace a new car and that was that;

10.) Sybil made more innuendos that I had stolen my car; and

11.) Sybil and Progressive Insurance were fascists.

The majority of the statements to which plaintiff objects are clearly matters of personal opinion, or alternatively, hyperbole no reasonable reader would believe. For example, whether or not plaintiff spoke in a "sinister" or "Gestapo" voice is a matter of Reeves' opinion, incapable of being proven or disproved. Indeed, it is unclear what Reeves means by a "Gestapo" voice or what such a voice would sound like. Similarly, Reeves' statement that plaintiff's action in using a tape recorder suggested to him that she was "on to [him]" is a matter of personal interpretation and opinion which the average reader is free to reject. Most of the remaining statements are "loose, figurative,

or hyperbolic" language no reasonable reader would take literally. *Milkovich*, 497 U.S. at 21, 111 L. Ed. 2d at 19. That plaintiff intended to take Reeves to a "gas chamber" or that her actions were equivalent to those of the "former Soviet security police" are the clearest examples of such hyperbole. Likewise, Reeves' assertion that plaintiff was a fascist is both opinion and hyperbole, and, in light of his comparison of plaintiff to communists, patently contradictory. Such contradictions highlight the frivolous tone and general tenor of absurdity throughout the article. *See Falwell*, 485 U.S. at 50, 99 L. Ed. 2d at 48 (First Amendment precluded recovery under state emotional distress action for ad parody which "could not reasonably have been interpreted as stating actual facts about the public figure involved"); *Letter Carriers v. Austin*, 418 U.S. 264, 284-86, 41 L. Ed. 2d 745 (1974) (the word "traitor" in literary definition of a union "scab" not basis for a defamation action under federal labor law as it was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members").

The remaining statements of which plaintiff complains center on Reeves' depiction of the processing of his insurance claim, which plaintiff asserts malign her in her trade or profession. For example, Reeves states that plaintiff "accused [him] of stealing his own car;" "forbade [him] from seeing [his] car;" and that Progressive "wasn't about to pay to replace a new car and that was that[.]" Although these statements arguably provide slightly stronger support for plaintiff's claim of libel, when the article is read as a whole, it is clear that Reeves' depiction of the processing of his claim is a highly individualized, personal interpretation tainted by his own emotions, rather than a journalistic, factual recounting of events. In his essay, Reeves is obviously disgruntled and frustrated by what he perceives to be Progressive's and plaintiff's negative attitudes towards his claim, and he makes no attempt to disguise his indignation, resorting to colorful and patently absurd descriptions of plaintiff and Progressive. For example, Reeves describes his response to plaintiff's interview as "capitulat[ing] to the interrogation." The reasonable reader readily perceives that Reeves is highly sensitive and irrational regarding even the most basic of plaintiff's actions in processing his claim. Reeves states several times that plaintiff implies that he might have stolen his own car, merely because plaintiff used a tape recorder while speaking to him, and because she informed him that the matter would be investigated. Reeves responds to plaintiff by "scream[ing] at [plaintiff]—you are taking my car from me." Reeves' open and obvious emotion and irrationality, combined with the absurd tone of the

piece, greatly detract from his credibility and provide the reader with facts from which his or her own conclusions may be drawn. *See Biospherics*, 151 F.3d at 185 (" 'Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the,reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.' ") (citation omitted). A reasonable reader would therefore recognize Reeves' statements against plaintiff as an "expression of outrage," unsupportive of a claim of libel. *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002).

The remaining statements are not even arguably defamatory to plaintiff. For example, Progressive's refusal to pay to replace a new car does not defame plaintiff in any manner. Nor does her alleged refusal to allow Reeves to "visit" his car.

Our Supreme Court has instructed that:

> The principle of common sense requires that courts shall understand [the alleged defamation] as other people would. The question always is how would ordinary men naturally understand the publication . . . . The fact that supersensitive persons with morbid imaginations may be able, by reading between the lines of an article, to discover some defamatory meaning therein is not sufficient to make them libelous.

*Renwick*, 310 N.C. at 318, 312 S.E.2d at 409 (quoting *Flake v. Greensboro News Co.*, 212 N.C. 780, 786-87, 195 S.E. 55, 60 (1938)).

Because the statements about which plaintiff complains are either (1) expressions of pure opinion not capable of being proven or disproven; or (2) rhetorical hyperbole which no reasonable reader would believe, the statements made by Reeves are constitutionally protected by the First Amendment, and the trial court properly dismissed plaintiff's complaint for libel. As plaintiff's claims for intentional infliction of emotional distress and unfair or deceptive practices necessarily depend upon the viability of her claim of libel, the trial court properly dismissed the remaining claims as well.

Affirmed.

Judges WYNN and STEELMAN concur.