IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-805

Filed: 19 February 2019

Forsyth County, No. 15 CVS 2690

RICHARD ALAN BRODKIN, Plaintiff,

v.

NOVANT HEALTH, INC., FORSYTH MEMORIAL HOSPITAL, INC., VOLKER
STIEBER, STEPHEN J. MOTEW, TIMOTHY S. COLLINS, and THOMAS H.
GROTE, Defendants.

Appeal by plaintiff from orders entered 30 June 2017 by Judge John O. Craig

and 1 February 2018 by Judge Anderson D. Cromer in Forsyth County Superior

Court. Heard in the Court of Appeals 14 November 2018.

*David B. Hough, P.A., by David B. Hough, for plaintiff-appellant.*

*Nelson Mullins Riley & Scarborough LLP, by G. Gray Wilson and Linda L.
Helms, for defendant-appellee Volker Stieber.*

*Constangy, Brooks, Smith & Prophete, LLP, by Kristine M. Sims and William
J. McMahon, IV, for defendants-appellees.*

DIETZ, Judge.

Dr. Richard Alan Brodkin was an oncologist treating cancer patients at

Forsyth Memorial Hospital[1] in Winston-Salem. In 2014, other oncologists at the

hospital became concerned about Dr. Brodkin's use of a treatment known as

---

[1] Forsyth Memorial Hospital is the legal name of the hospital, which the record indicates presently does business under the name Novant Health Forsyth Medical Center.

"induction chemotherapy." Ultimately, following disagreements in a collaborative meeting intended to ensure best practices, one of the other oncologists took his concerns to the head of the department. This resulted in a series of discussions, investigations, and reports that led the hospital to present Dr. Brodkin with an ultimatum: sign a letter agreeing to limit some treatment practices, or be fired.

When Dr. Brodkin refused to sign the letter, the hospital terminated his employment. Dr. Brodkin then filed this lawsuit, which included claims for breach of contract, wrongful discharge, tortious interference, fraud, and defamation. The trial court granted summary judgment in favor of the Defendants on all claims, and this appeal followed.

As explained below, the bulk of Dr. Brodkin's claims fail because his employment contract was terminable without cause and the hospital's decision to terminate the contract was neither a breach of contract nor a violation of our State's public policy. The fraud claim fails because there is no evidence of fraud in this record. The defamation claim fails because the challenged statements are protected by qualified privilege. Thus, because the trial court properly concluded that the defendants were entitled to judgment as a matter of law on all claims, we affirm the court's order.

**Facts and Procedural History**

In 2010, Forsyth Memorial Hospital purchased Dr. Richard Alan Brodkin's

oncology practice. As part of the purchase, Dr. Brodkin became an employee of the hospital. When he began employment, he signed a contract entitled "Physician Employment Agreement." The contract contained various terms of the parties' employment relationship. The contract was terminable without cause by either party and had no definite term.

As part of his employment duties as an oncologist, Dr. Brodkin attended collaborative meetings with other hospital physicians who treat cancer patients. Together, these physicians would review patients' case files to ensure that the hospital's patients were receiving the best treatment possible. The meetings were referred to as "Tumor Board" meetings.

This case arose out of a disagreement among physicians attending these Tumor Board meetings. Some of Dr. Brodkin's fellow oncologists, including Dr. Volker Stieber, were concerned that Dr. Brodkin's use of a treatment known as "induction chemotherapy" was inconsistent with National Comprehensive Cancer Network guidelines—a set of guidelines that reflected recommended treatment approaches from experts around the country—and that these induction chemotherapy treatments were not the appropriate course of treatment for Dr. Brodkin's patients.

Ultimately, Dr. Stieber complained to Dr. Susan Hines, the head of medical oncologists at the hospital. Dr. Hines asked Dr. Stieber to provide a list of patients who were impacted, and a description of Dr. Stieber's concerns with those patients'

treatment. In response, Dr. Stieber prepared an email that summarized Dr. Brodkin's care of ten patients and explained why Dr. Stieber and some of his colleagues disagreed with those treatment decisions. Dr. Stieber's email did not reference Dr. Brodkin by name but it described the induction chemotherapy treatments provided to ten of Dr. Brodkin's patients and explained that Dr. Stieber and his "group" of physicians had concerns about whether this was the appropriate course of treatment. Dr. Stieber sent the email directly to Dr. Hines, copying Dr. Dawn Moose, but the record indicates that the email eventually circulated to other employees of the hospital.

In November 2014, Dr. Timothy Collins, the hospital's oncology service line lead, and Dr. Thomas Grote, the hospital's oncology practice lead, met with Dr. Brodkin to discuss Dr. Stieber's email. According to Dr. Brodkin, he was unaware of Dr. Stieber's email until this November meeting. Dr. Collins gave Dr. Brodkin one week to respond to the issues identified in Dr. Stieber's email and told him that Dr. Grote would later evaluate the situation and make a recommendation. Dr. Brodkin spent days reviewing his patients' records and preparing a response, which he then submitted to Dr. Grote.

Later, at the request of Dr. Collins and other supervisory staff at the hospital, Dr. Grote began a further review of Dr. Brodkin's patient care by forming a committee that consisted of oncologists from various specializations. The committee prepared a

report with a series of forward-looking recommendations for Dr. Brodkin's treatment of patients.

On 4 February 2015, Dr. Stephen J. Motew, a hospital administrator, met with Dr. Brodkin and gave him a letter outlining the hospital's expectations moving forward. The expectations letter stated that Dr. Brodkin must follow the National Comprehensive Cancer Network guidelines "in virtually every case" and that if he departed from those guidelines in treating a patient he must first take the issue to the "tumor board for multidisciplinary discussion and approval." The letter stated that "[b]eginning immediately, you will follow the expectations outlined above providing patient care pursuant to the guidelines."

Dr. Motew told Dr. Brodkin that, if he did not sign this expectations letter, the hospital would terminate Dr. Brodkin's employment. Dr. Brodkin refused to sign the letter because he believed that "he was being punished, because other people's interpretation of the [NCCN] guidelines was not correct" and "the expectations were ridiculous, because [he] followed the guidelines in every case." Two days later, Dr. Brodkin circulated a lengthy email to his fellow medical oncologists at the hospital in which he explained why he believed his induction chemotherapy treatments were appropriate.

On 26 February 2015, Dr. Grote and Dr. Collins sent a letter to Dr. Motew discussing Dr. Brodkin's refusal to sign the expectations letter and stating that

"[s]ince [Dr. Brodkin] is unwilling to sign this letter and commit to the group's consensus of our Standard of Care, we support his termination of employment at this time." On 27 February 2015, Dr. Motew again met with Dr. Brodkin and asked that he sign the letter. Dr. Brodkin refused. Dr. Motew then offered Dr. Brodkin the opportunity to resign, which Dr. Brodkin declined. The hospital then terminated Dr. Brodkin's employment.

Dr. Brodkin later sued the Defendants, asserting claims including breach of contract, wrongful discharge, fraud, tortious interference with contract, and defamation. After an opportunity for full discovery, the trial court granted summary judgment in favor of the Defendants on all claims in orders entered 30 June 2017 and 1 February 2018. Dr. Brodkin timely appealed.

**Analysis**

Dr. Brodkin argues that the trial court erred by granting summary judgment in favor the Defendants on each of the claims he asserted in this action. This Court reviews an appeal from summary judgment *de novo. In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). When

considering a summary judgment motion, we view the evidence in the light most favorable to the non-movant. *Jones*, 362 N.C. at 573, 669 S.E.2d at 576.

## I.     Breach of Contract Claim

We begin with Dr. Brodkin's breach of contract claim. To establish a breach of contract claim, there must be: (1) the existence of a valid contract and (2) a breach of a contractual term. *McKinnon v. CV Indus., Inc.*, 213 N.C. App. 328, 333, 713 S.E.2d 495, 500 (2011).

Our analysis of this claim involves two separate clauses in the employment contract, and we quote the relevant contract language here for ease of understanding. First, the contract provides that Dr. Brodkin "will have exclusive control over decisions requiring professional medical judgment":

> 3. <u>DUTIES AND EXTENT OF SERVICES</u>
>
> a. <u>Practice of Medicine</u>. . . . Physician shall exercise independent professional judgment in the treatment and care of patients and, in this regard, will have exclusive control over decisions requiring professional medical judgment.

Second, the contract provides that either party may terminate it without cause by providing 90 days' notice:

> 14. <u>TERMINATION OF EMPLOYMENT</u>
>
> . . .
>
> b. <u>Termination Without Cause</u>. Either party may terminate Physician's employment without cause by providing the other party at least ninety (90) days' written notice of its intention to terminate, such termination to be effective as of the date specified

> in the notice, but not prior to the expiration of the ninety (90) day
> notice period.

Dr. Brodkin's argument is straightforward. He contends that, when the hospital presented him with the expectations letter and demanded that he sign it or be fired, the hospital breached the contract. He argues that the expectations letter would have required him to pursue courses of treatment with which he disagreed, thus eliminating his exclusive control over decisions involving his professional medical judgment. Because the contract guaranteed that he would retain exclusive control of his medical judgment, Dr. Brodkin contends that the hospital's demand to sign the expectations letter breached the contract.

The flaw in this argument is that, even assuming Dr. Brodkin's interpretation of the professional judgment clause is correct (the hospital disagrees with that interpretation), there is no evidence that the hospital ever prevented Dr. Brodkin from exercising his professional judgment, or that it took any disciplinary action against him for exercising that independent judgment. The hospital only sought to monitor (and potentially restrict) Dr. Brodkin's *future* treatment decisions. It did so by requesting that Dr. Brodkin agree to either amend the contract or waive the professional judgment clause as a condition of continuing the parties' contractual relationship (which the hospital could terminate at any time).

Put another way, what happened here is what happens in countless contract relationships that are terminable without cause at any time: one party indicated that

it would need to terminate the contract unless the parties agreed to change the terms. So long as the party requesting the change has not yet materially breached the contract (as is the case here), requesting an amendment or waiver of an otherwise binding contract term is not a breach. *See, e.g.*, *Varnell v. Henry M. Milgrom, Inc.*, 78 N.C. App. 451, 454, 337 S.E.2d 616, 618 (1985). Thus, because the hospital had not breached the contract at the time it terminated without cause, the trial court properly determined that the hospital was entitled to judgment as a matter of law on Dr. Brodkin's breach of contract claim.

## II.     Wrongful Discharge Claim

We next address Dr. Brodkin's claim that his termination for refusing to sign the expectations letter violated North Carolina public policy and thus amounted to wrongful discharge. Ordinarily, an employee whose contract is terminable without cause "has no claim for relief for wrongful discharge." *Privette v. Univ. of North Carolina at Chapel Hill*, 96 N.C. App. 124, 133, 385 S.E.2d 185, 190 (1989). But there is a limited exception to this rule where the termination runs contrary to our State's public policy. *Considine v. Compass Grp. USA, Inc.*, 145 N.C. App. 314, 317, 551 S.E.2d 179, 181 (2001). To prevail, "the employee has the burden of pleading and proving that the employee's dismissal occurred for a reason that violates public policy." *Id.*

Dr. Brodkin has not met that burden here. He contends that N.C. Gen. Stat. § 90-14(a)(6), a statute that protects physicians from certain regulatory discipline for pursuing experimental treatments, demonstrates a North Carolina public policy in favor of safeguarding physician independence. But even assuming this is true—an issue we need not address today—that would not prevent a hospital from discharging an employee whose medical decisions, in the hospital's view, are harmful to its patients.

As the Oregon Court of Appeals has observed, "although [a doctor] may have had a duty to exercise his professional judgment, other doctors had no duty to agree with him, nor did [a hospital] have an obligation to accept [the doctor's] judgment over the judgment of its other doctors." *Eusterman v. Northwest Permanente, P.C.*, 129 P.3d 213, 220 (Or. App. 2006). Put another way, even assuming there is a public policy protecting physicians' independent judgment, that policy would not force an employer (whether a hospital or other physicians in a shared practice) to continue employing or partnering with a physician whose professional judgment they believe is wrong. Accordingly, we reject Dr. Brodkin's public policy argument and hold that the trial court did not err in granting summary judgment on the wrongful discharge claim.

## III.    Fraud Claim

We next address Dr. Brodkin's fraud claim. Dr. Brodkin argues that the

hospital committed fraud when the parties initially entered into an employment contract nearly a decade ago. He asserts that the hospital never had any intention of affording Dr. Brodkin independent medical judgment, despite the professional judgment language in the contract, and mispresented that fact to Dr. Brodkin during contract negotiations.

To establish a claim of fraudulent misrepresentation, the plaintiff must show: (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive; (5) resulting in damage to the injured party. *Taylor v. Gore*, 161 N.C. App. 300, 303, 588 S.E.2d 51, 54 (2003).

Here, there is no evidence in the record that the hospital either falsely represented any material fact concerning the employment contract or intended to deceive Dr. Brodkin about any material fact in the contract. As explained above, at best, the record indicates that the hospital sought to limit some of Dr. Brodkin's treatment methods after other oncologists expressed concerns. This occurred many years after the parties entered into the employment contract. There is nothing in the record from which a reasonable jury could infer that the hospital made any misrepresentations, or intended to deceive Dr. Brodkin, at the time the parties entered into the contract. Accordingly, the trial court properly granted summary judgment on this claim.

## IV.    Tortious Interference With Contract Claim

We next address Dr. Brodkin's claim that Dr. Grote tortiously interfered with the employment contract. To establish a claim for tortious interference with contract, there must be "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *United Labs, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

Dr. Brodkin claims that Dr. Grote induced the hospital not to afford Dr. Brodkin his right to his own professional medical judgment, which in turn breached the professional judgment clause in the contract. This claim fails because, as explained above, the hospital did not breach the contract. Moreover, when the person who allegedly interferes with the contract is an employee of the defendant, the plaintiff must show that the alleged interference was unrelated to a "legitimate business interest" of the employee. *McLaughlin v. Barclays American Corp.*, 95 N.C. App. 301, 308, 382 S.E.2d 836, 841 (1989). Here, the record indicates that hospital administrators tasked Dr. Grote with investigating and addressing concerns about Dr. Brodkin's treatment of patients. There is no evidence in the record that Dr. Grote pursued that investigation for reasons other than his legitimate interest in carrying

out his own role within the hospital hierarchy. Accordingly, the trial court properly entered summary judgment on this tortious interference claim.

## V. Defamation Claim

Finally, we address Dr. Brodkin's defamation claim against Dr. Stieber. Dr. Brodkin argues that Dr. Stieber defamed him by emailing a hospital administrator expressing concerns about Dr. Brodkin's treatment of patients. Because the communications are protected by the affirmative defense of qualified privilege, we disagree.

"To be actionable, a defamatory statement must be false and must be communicated to a person or persons other than the person defamed." *Daniels v. Metro Magazine Holding Co, L.L.C.*, 179 N.C. App. 533, 538–39, 634 S.E.2d 586, 590 (2006). But even if a statement satisfies these criteria for defamation—an issue we need not reach in this case—the defendant can assert the affirmative defense of qualified privilege. *Stewart v. Nation-Wide Check Corp.*, 279 N.C. 278, 283, 182 S.E.2d 410, 414 (1971). Qualified privilege is established if the communication is made in good faith, there is an interest to be upheld, the statement is limited in scope to its purpose, the publication is directed to proper parties, and the statement was not made with malice or through excessive publication. *Harris v. The Proctor & Gamble Mfg. Co.*, 102 N.C. App. 329, 331, 401 S.E.2d 849, 850–51 (1991).

Evening assuming Dr. Stieber's email otherwise would be defamatory (and we are not persuaded that it would be), the email is protected by qualified privilege. The email addressed legitimate concerns Dr. Stieber had with the course of treatment for many of Dr. Brodkin's patients. Ensuring that cancer patients receive the appropriate medical treatment is unquestionably an important interest for all parties in this lawsuit, including Dr. Stieber. Moreover, there is nothing in the record from which a reasonable jury could infer that Dr. Stieber acted with any malice or bad faith; to the contrary, the record indicates that Dr. Stieber had a good faith disagreement with a fellow cancer doctor about the appropriate course of treatment during a meeting designed to encourage honest debate. Dr. Stieber discussed those concerns with the hospital's head of oncology, who requested that Dr. Stieber compile the concerns in an email. That is precisely what Dr. Stieber did in this case. Accordingly, the trial court properly granted summary judgment on the defamation claim because it is barred by the affirmative defense of qualified privilege.

## Conclusion

For the reasons stated above, we affirm the trial court's orders.

AFFIRMED.

Chief Judge McGEE and Judge ARROWOOD concur.