rFactr, Inc. v. McDowell, 2025 NCBC 64.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18CVS012299-590

RFACTR, INC.; RICHARD
BRASSER; and GREG GENTNER,

       Plaintiffs/Counterclaim
Defendants,

v.

CHRIS MCDOWELL AND
CAROLINE MCDOWELL,

       Defendants/Counterclaim
Plaintiffs,

v.

MEGAN BRASSER,

       Counterclaim Defendant.

**ORDER AND OPINION ON MOTION
BY DEFENDANTS CHRIS
MCDOWELL AND CAROLINE
MCDOWELL FOR SUMMARY
JUDGMENT ON THEIR
DEFAMATION CLAIMS**

1. **THIS MATTER** is before the Court on the 15 May 2025 filing of the *Motion by Defendants Chris McDowell and Caroline McDowell for Summary Judgment on Their Defamation Claims* (the Motion). (ECF No. 274 [Mot.].)

2. For the reasons set forth herein, the Court **DENIES** the Motion.

*James, McElroy & Diehl, P.A., by John R. Buric and John R. Brickley, for Plaintiff rFactr, Inc.*

*Lincoln Derr PLLC, by Phoebe Norton Coddington and Sara R. Lincoln, for Plaintiff Greg Gentner.*

*Lincoln Derr PLLC, by Phoebe Norton Coddington and Sara R. Lincoln, and Clawson and Staubes, LLC, by Jeremy S. Foster, for Plaintiff/Counterclaim Defendant Richard Brasser.*

*Rosenwood, Rose & Litwak, PLLC, by Erik M. Rosenwood, for Defendants/Counterclaim Plaintiffs Chris McDowell and Caroline McDowell.*

*Clawson and Staubes, LLC, by Jeremy S. Foster, for Counterclaim Defendant Megan Brasser.*

Robinson, Chief Judge.

## I.    INTRODUCTION

3.    This action arises out of the discontinuance of Plaintiff rFactr, Inc.'s (rFactr) operations, and the related degradation of the relationship between Counterclaim Plaintiffs Caroline McDowell (Mrs. McDowell) and Chris McDowell (Mr. McDowell; and with Mrs. McDowell, Counterclaim Plaintiffs), on the one hand, and Counterclaim Defendants Richard Brasser (Mr. Brasser) and Megan Brasser (Mrs. Brasser; and with Mr. Brasser, Counterclaim Defendants), on the other. Counterclaim Plaintiffs allege that Counterclaim Defendants made defamatory statements about them on various online platforms.

## II.    FACTUAL BACKGROUND

4.    The Court does not make findings of fact when ruling on a motion for summary judgment. *DSM Dyneema, LLC v. Thagard*, 2019 NCBC LEXIS 44, at *2 (N.C. Super. Ct. June 19, 2019) (citing *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975)). Instead, to provide context for its ruling, the Court recites those facts that it believes "are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sep. 26, 2017).

### A.    <u>The Parties</u>

5.    Counterclaim Plaintiffs are citizens and residents of Richmond, Virginia. (Joint Appendix 153–54 at ¶¶ 1–2, ECF No. 280.1 [J.A.]; J.A. 219–20 at ¶¶ 1–2.)

Mr. McDowell was a preferred shareholder, warrant holder, and convertible note holder of rFactr. (J.A. 153–54 at ¶ 1; J.A. 219 at ¶ 1.)

6. Counterclaim Defendants are citizens and residents of Mecklenburg County, North Carolina. (J.A. 154 at ¶¶ 4–5; J.A. 220 at ¶¶ 4–5; J.A. 241 at ¶¶ 4–5.) Mr. Brasser is the former Chief Executive Officer of rFactr. (J.A. 154 at ¶ 4; J.A. 220 at ¶ 4.)

## B.    The Initial Action

7. In August 2018, rFactr, Mr. Brasser, and Greg Gentner[1] (Mr. Gentner) sued Counterclaim Plaintiffs for, among other claims, defamation. (J.A. 155 at ¶¶ 10–14; J.A. 220–21 at ¶¶ 10–14; J.A. 242–43 at ¶¶ 10–14.) One basis for the defamation claims was an alleged statement by Mrs. McDowell that rFactr's owners were under investigation for arson.[2] (J.A. 36–38; J.A. 155 at ¶ 14; J.A. 221 at ¶ 14; J.A. 243 at ¶ 14; J.A. 316–20.) Mrs. McDowell purportedly made the statement during a 2017 phone call with Jackson National Life Insurance Company (Jackson), a company with which rFactr had been in contract negotiations at the time. (J.A. 308 at 139:3–10; J.A. 315 at 154:19–25; J.A. 316–20; J.A. 323 at 202:4–25.) After Mrs. McDowell's phone call, Jackson informed rFactr that it would no longer pursue a contract with rFactr. (J.A. 15–16 at ¶¶ 20, 29–30.) rFactr later ceased operations. (J.A. 9 at ¶¶ 80, 82; J.A. 20.) rFactr, Mr. Brasser, and Mr. Gentner alleged that

---

[1] Mr. Gentner, a non-party to the counterclaims at issue, is the former Chief Operating Officer of rFactr. (J.A. 14 at ¶ 6.)

[2] Due to a lack of evidence that Mr. McDowell was involved with Mrs. McDowell's phone call, the Court dismissed the defamation claim against Mr. McDowell. (ECF No. 223.)

rFactr's closure arose from Mrs. McDowell's call to Jackson. (2d Am. Compl. ¶¶ 86, 89–95, ECF No. 16; J.A. 9.)

8. On 3 June 2019, Mrs. McDowell was deposed. (J.A. 305.) She admitted that, at some point prior to the initiation of the action, she consulted with a private investigator about surveilling Counterclaim Defendants to "find out what was going on, where they were, what they were doing, [and] what they had done with [investors'] money." (J.A. 325 at 243:12–25.) Mrs. McDowell also stated that, in the latter half of 2017, she looked at the social media posts of one of Counterclaim Defendants' children to determine the location of Counterclaim Defendants' family. (J.A. 340–43 at 299:6–302:20.)

9. On 2 November 2021, Mr. Brasser was deposed. (J.A. 346.) He testified that Mr. McDowell was compensated with rFactr stock for introducing new investors to the company, and that he confronted Mr. McDowell for failing to disclose such compensation to the new investors. (J.A. 347–49.)

10. On 8 February 2023, the Court entered an order staying this action because Mr. Brasser and Mr. Gentner were criminally indicted in the United States District Court for the Western District of North Carolina. (J.A. 132–33.)

**C.** **Conduct During the Stay of the Action**

11. In September 2023, Mr. Brasser, with the participation and knowledge of Mrs. Brasser, created a fundraiser on a website called GiveSendGo (the Fundraiser). (J.A. 158 at ¶¶ 31, 33, 35; J.A. 223 at ¶¶ 31, 33, 35; J.A. 247 at ¶ 33.) The Fundraiser was titled "Brasser Family Justice." (J.A. 158 at ¶ 32; J.A. 187–91.) The Fundraiser

sought financial support for legal bills, security, and a re-opening of the investigation into a 2016 fire at Counterclaim Defendants' home.[3] (J.A. 187–88.)

12. In part, the Fundraiser, in the voice of Mr. Brasser, stated as follows:

It was 7 years ago tonight, just before midnight, that [Mrs. Brasser] woke me up and said, "I think our house is on fire". We were so fortunate to all get out alive[.] . . . What I didn't know was that our happy, simple, and naïve life was up in smoke as well.

What we couldn't have known was that we had predators targeting us, and they were bent on ruining our lives both personally and professionally. Days after our fire, [Mrs. Brasser] was warned by one of our contractors demoing what remained of our house. He had overheard a well-to-do couple walking through our charred home, laughing and saying, "I guess the Brasser's [sic] don't have the perfect little life anymore." He told [Mrs. Brasser] that we had enemies, but the thought of that was too traumatic for her to even contemplate.

Now having years of experience and evidence, it is unfortunately true. What might have started off grounded in envy, grew into a psychopathic obsession to bring me down. Before our house fire, I had uncovered that one of the perpetrators, an investor in my company, was not disclosing that he was being compensated with stock for introducing other investors. That is called securities fraud and is an existential and criminal problem since he is a Wall Street bond trader. He and his wife aimed to sabotage my reputation and my company and oust me as CEO to cover-up their crimes.

We ended up catching them in many wrongdoings including killing a multi-million-dollar deal and orchestrating a smear campaign to turn my investors against me and stop our funding. We filed a civil lawsuit not realizing that they had friends in very high places. The wife's father was a 40-year Federal Reserve executive, and they leveraged their unique influence with the Department of Justice to make a presentation accusing me of all kinds of crazy things including arson, stealing investor's [sic] money, robbing my own storage unit, and fleeing the country. Just 3 weeks before our trial

---

[3] Counterclaim Plaintiffs allege that, in or around June 2024, the Fundraiser was edited to remove "some of [its] more inflammatory comments." (J.A. 167–68 at ¶¶ 92–96; J.A. 217–18.) Because the edited version of the Fundraiser is not a basis for Counterclaim Plaintiffs' defamation claims, the Court does not address it further.

against them, the DOJ brought charges against me for delinquent taxes back in 2016. These are taxes that were delinquent because the crazy couple was sabotaging the company and when we couldn't pay [the taxes owed], we notified the IRS and entered the Voluntary Disclosure Program. . . . Despite the IRS never referring me for prosecution, the Department of Justice proceeded to indict me in 2023 in what has been described as unlike any case in the history of the United States.

I quickly realized that you are NOT innocent until proven guilty. What really happens is . . . you are treated like a convicted criminal. It is a horrific experience to say the least. We are doing everything we can to to [sic] get by. In fact, [Mrs. Brasser] is even waiting tables at a local restaurant. The trial is not until February, and our total legal bills are soon reaching 7 digits. We are also in need of funding to reopen the investigation of our fire as we think the timing was precisely too perfect with bankruptcy motives and even their own words that our fire was intentional. We also realize just how far this psychopathic couple will go and for that we are needing security to keep our family safe.

I know that this is a lot to digest[.] . . . What is happening is just plain wrong and evil, but we continue to believe in truth, justice and the goodness of God.

(J.A. 187–88.)

13. On 14 October 2023, Mrs. Brasser made a Facebook post containing a link to the Fundraiser and an embedded YouTube video titled "Brasser Family Justice." (J.A. 179–80); Megan Brasser, *Brasser Family Justice* (YouTube, Oct. 14, 2023), https://www.youtube.com/watch?v=7A3RHMY0IFE. Mr. Brasser was tagged in the post and left a comment on it thanking others for their support. (J.A. 180.) Mrs. Brasser also left a comment on the post stating that she would not teach her children to "let [their] babies be set on fire and let their dad go to jail for the real criminals' crimes," nor would she "[l]et the bullies steal [Mr. Brasser's] invention[.]" (J.A. 181.)

14.    Mrs. Brasser alone appears in the "Brasser Family Justice" video. *Brasser Family Justice, supra*.[4]  In it, she states that Counterclaim Defendants sought monetary donations for multiple reasons, including the legal fees associated with the criminal trial of Mr. Brasser and Mr. Gentner.   *Id.*; (J.A. 162 at ¶ 61; J.A. 254 at ¶ 61).

15.    Mrs. Brasser also states that certain unnamed individuals are "top-notch manipulators," *Brasser Family Justice, supra*, at 01:19–01:25, and that "the loss of our things . . . will be directly traced back to the time when two people came into our lives[.]" *Id.* at 02:35–02:46.  Further, she states that "we have a predator problem," "these predators are capable of the unthinkable," and a portion of the donations received would "go towards the security of our family." *Id.* at 04:45–04:55, 09:40–09:55. Additionally, Mrs. Brasser states that a portion of the donations would be used to "reopen a second fire investigation privately since, so far, the government and the [sic] law enforcement is not protecting my children or my family from a woman up in Richmond that calls our fire purposeful and has clear motives[.]" *Id.* at 04:57–05:26. Later in the video, Mrs. Brasser reiterates that the donations would go toward the

---

[4] The Court takes judicial notice of the fact that Mrs. Brasser made the referenced statements in the "Brasser Family Justice" video.  YouTube's "authenticity is not in dispute," and the statements Mrs. Brasser makes in the video are "capable of accurate and ready determination" because the video is still accessible online. *See Herrera v. Charlotte Sch. of L.*, 2018 NCBC LEXIS 35, at *21 (N.C. Super. Ct. Apr. 20, 2018) (taking judicial notice of the fact that certain documents were available on a party's website but not the accuracy of the facts in such documents); *see Woodall v. Walt Disney Co.*, 2024 U.S. Dist. LEXIS 241696, at *11–12 (C.D. Cal. Nov. 1, 2024) (taking judicial notice of the existence of YouTube videos and the information therein, but not of "the truth of the contents therein").  For the same reason, the Court takes judicial notice of the fact that Mrs. Brasser made certain statements in her other YouTube videos, which the Court references *infra*.

"reopening of a fire investigation . . . [to] see if my family was purposely put on fire." *Id.* at 07:40–07:55.

16. As to the criminal action against Mr. Brasser and Mr. Gentner, Mrs. Brasser expresses hope "for a wonderful federal judge . . . [who] can sniff fishiness from a state away." *Id.* at 11:58–12:09. She further expresses hope that the judge "will take an interest in finding out and investigating how this case even got to his courtroom and who presented it, and how can perpetrators who stalk children and call a fire 'arson' be getting things into a courtroom on a federal level." *Id.* at 12:06–12:30. The description of the video states, in part, the following: "[c]owards up in Richmond plotted a secret war on my family all while pretending to be our dearest of friends. They have used law enforcement [and] government resources (your tax dollars) every step of the sick ways they have terrorized my family for an entire decade!!" *Id.*, video description.

17. On 17 October 2023, Mrs. Brasser uploaded another YouTube video titled "False Accusation #1." (J.A. 163 at ¶ 70); Megan Brasser, *False Accusation #1* (YouTube, Oct. 17, 2023), https://www.youtube.com/watch?v=p22mRzvySnU. Mrs. Brasser begins the video by stating that she aims to "illuminat[e] our situation so we can help victims of a couple that I am a hundred percent positive are predators with power." *False Accusation #1, supra*, at 00:00–00:20. Mrs. Brasser then recalls an incident in 2012 where she was pulled over by officers from the "Charlotte Police Department," who had received a tip that she was driving a stolen vehicle. *Id.* at 00:39–00:51, 02:27–03:54. She recounts that the stop ended once the officers realized

that the license plates had, by an unknown person's doing, been switched on her and Mr. Brasser's vehicles.  *Id.* at 03:37–05:45.  She notes that many of her friends drove past her during the stop and subsequently called her, except for an unnamed woman who "lives up in Richmond [and] lived in Charlotte until 2013."  *Id.* at 04:10–04:30, 06:03–06:54.  She also notes that the unnamed woman brought up the traffic stop "at a party in front of other people," which was "just odd."  *Id.* at 06:54–07:01.  She ends the video stating, "I'm going to leave it at that—only [the] Charlotte Police Department knows who [its] informant is."  *Id.* at 07:01–07:06.

18.    On 1 January 2024, Mrs. Brasser uploaded a video titled "Mr & Mrs ManCode" to YouTube.[5]  (*See* J.A. 350.)  In this video, Mrs. Brasser recounts that "this person that [she] really trusted as [Mr. Brasser's] good friend" made certain statements that caused her to become suspicious of Mr. Brasser.  Megan Brasser, *Mr & Mrs ManCode* (YouTube, Jan. 1, 2024).  Mrs. Brasser calls this individual "Chris" and notes that he was "up in Richmond."  *Id.*  She then distinguishes the "real [Mr.] Brasser" from the "made-up, suspicious version [of Mr. Brasser] by a couple up in Richmond that has a very clear agenda, and very clearly does not want good things for my family, at all."  *Id.*  She ends the video with the following statement: "From now on, I call them Mr. and Mrs. ManCode up in Richmond.  I'll leave out even the Richmond part.  You'll know who Mr. and Mrs. ManCode are from now on."  *Id.*

---

[5] The "Mr & Mrs ManCode" video is no longer accessible via YouTube, but Counterclaim Plaintiffs provided a recording of the video to all parties and the Court.  Thus, the Court takes judicial notice of its contents.  *See Herrera*, 2018 NCBC LEXIS 35, at *21.

19. On 13 March 2024, Mrs. Brasser made a post on Facebook tagging Mr. Brasser, which Mr. Brasser also shared. (J.A. 166 at ¶¶ 85–86; J.A. 228–29 at ¶¶ 85–86.) The post contains an update on the criminal action against Mr. Brasser and Mr. Gentner:

> TRIAL UPDATE where [Mr. Brasser] was facing 8 charges the past week;
>
> [Mr. Brasser] and [Mr. Gentner] were charged with 5 felonies yesterday for exactly what they self-reported, ACCOUNTED FOR!!!!!!!! (See public evidence as DOJ news release says opposite), and paid back in full over a course of 5 years to ultimately be resolved in 2021. They also paid back penalties AND INTEREST! Where is the victim?
>
> In other words, [Mr. Brasser] received the ultimate punishment for telling on himself, taking full responsibility for his COO's mistake (as the CEO of the company) and making years of communications with the IRS to be as transparent as possible.
>
> These 2 men stood like men and stood up for each other, and kept their employees['] jobs. [Mr. Brasser] personally paid health insurance for his employees when his company got sabotaged. WHO DOES THAT? And then gets accused of being greedy in federal court? Are you kidding me? The man who put every investor ahead of himself and his own family even though he himself lost his entire life savings in the company. He is accused of being his polar opposite by our government betraying our public trust by cherry picking a story to match the false narrative they received from the very people intending a hostile takeover by bankrupting company [sic] and screwing all 30+ investors and the government itself of tax liabilities.
>
> . . . .
>
> If you look at what the DOJ released in [the] 2023 indictment as far as the charges and the numbers used/owed, you will see [a] HUGE difference in [the] amounts they now claim. WHY IS THERE A HUGE CHANGE IN THEIR STORY AND THEIR NUMBERS???!!! AND WHY DID THEY BLOCK [MR. BRASSER] AND ALL PROFESSIONALS FROM KNOWING THESE NUMBERS AND PAYING THEM OFF SINCE 2019??? Is it a coincidence that was shortly after Federal Reserves Daddy's little girl got caught red handed and sued in civil

trial??  This is just the beginning of the questions we have and the smell of rotting fish is only getting stronger.

There were 3 counts [Mr. Brasser] was EXONERATED on yesterday which include all the claims he lied/cheated on tax forms/and/or evaded taxes.  Those claims were a circus show from the start.

. . . .

Why did the IRS Voluntary Disclosure Program promise to wait for the trial of the couple who illegally sabotaged the [sic] rFactr (lawsuit online) to hide MR and MRS Richmond's own tax crimes and much more serious crime of security fraud?  Taking you back to 2023, [Mr. Brasser] was indicted 3 weeks before this Richmond couple was facing their own trial?  Holding this couple accountable should be priortiy [sic] for IRS since they were the #1 benificiary [sic] of the sums they seeked [sic] to collect!

IS THIS REALLY ABOUT TAXES??!  OR DOES THIS wreak [sic] of A WITCH HUNT!??

By the way, why has Mr Richmond not reported his numerous lawsuits for security fraud and false tax returns to FINRA?  It is required by law if you are a wall street trader.  How many crimes are they hiding?  They certainly know what we did not [. . .] that voluntarily disclosing anything to the government is just putting a TARGET on your head.

DO NOT EVER TRUST THE IRS SELF DISCLOSURE PROGRAM.  It is a Bait and Switch!!!!  Google the program.  Then look at my family!

Following is a list of everything [Mr. Brasser] has been FALSELY accused of in this investigation that has cost 3 million dollars upwards of your tax dollars and turned up ZERO evidence.  Just so the Charlotte US Attorney[']s Office can save face by charging him with [the] only thing that was true.  My husband is now a FELON for being the honest man who stood by another honest man.  There is no other such case in [the] history of [the] United States!!!

. . . .

During the trial, [the] prosecutor accused us of taking advantage of [Mr. Brasser's] father while he was in our care.  How low can you go?  Oh, I will tell you how she went even lower.  In her closing argument, she said "when Brasser home was set on fire[.]"

WHAT???!

And the list of questions will continue[.]

Good always wins over evil [. . .] keeping the faith. And I am very proud to be the wife of the first American Man ever convicted in these circumstances yet he still stands in his truth and gets up in the morning to hug his kids and make me a latte.

[Mr. Brasser] will not be judged for self-reported paid off taxes, and those that dare to better look in the mirror because if your life was under the microscope with every detail of your family's entire lives sitting in boxes in [the] Charlotte US Asst Attorney[']s office and they slung all mud onto a wall to see what they could somehow get to stick and their bs just ran downstream!! So they had to be right to justify the wild goose chase and resorted to the one thing you already told them, well a target of the government is [r]arely this flawless so huge kudos to my man! And SHAME ON THEM for they know right from wrong and so wrong this is!! What a waste of your taxpayer money and what a MOCKERY TO [THE] JUSTICE SYSTEM! This is not what we stand for, America!! We do not take down small business owners and let the wall street sharks win!

We will rise and I hope to God Charlotte rises now, too! The truth is HERE for all to see!!

(J.A. 193–99.)

20.     In one comment to the post, Mrs. Brasser stated that the criminal action against Mr. Brasser was "[p]etty and personal beyond any valid excuse[.]" (J.A. 202.) In another comment, she stated, "I wish [the judge] would have allowed evidence of [the] Richmond couple as this would all be over today. Jurors would have known where all the smoke was coming from figuratively if not literally." (J.A. 203.)

21.     On 14 March 2024, Mrs. Brasser made another post on Facebook stating, in part, the following:

Just to break it down – you are witnessing bullying at [the] most sophisticated power level in the United States!

My husband was charged with 5 counts[,] which represent 5 quarters[,] which means 1 year 3 months he voluntarily disclosed he was having trouble staying in time with taxes.  Same time frame as our house fire that Richmond couple refer to as Arson !  And same time Richmond couple was illegally sabatoging [sic] my husband[']s huge company deals.  There is no case in history where 2 men got charged with late self[-]reported taxes with no tax evasion or fraud whatsoever, and to call it FIVE felonies is so out of scale it's insulting to all of our intelligence.

AND iTS [sic] BEEN PAID BACK !!

Are we being punked?  Nope just totally hunted by people who still want my husband[']s invention!!  No one gets struck by lightening [sic] 12 times the same time frame psychopaths come into their lives.  Am I really to believe all my husband[']s failed contracts in [the] last hour of deal making is an isolated event to our fire, our burglary, our several thefts, the stalking of my children and now the most out of scale, jaw dropping conviction for a 100k tax we don't even personally owe??!!?

(J.A. 205.)

22.    On 15 March 2024, Mrs. Brasser made another Facebook post tagging Mr. Brasser.  (J.A. 166–67 at ¶ 88; J.A. 261 at ¶ 88.)  The post contained a video of Counterclaim Defendants' family with, in part, the following caption:

Who knew my husband[']s contracts were being sabatoged [sic] at the time of this video?  And who knew our house, in [the] prosecutor's own words, would be "set on fire" while we slept very soon after this?  Who knew a prosecutor would take a case from the very people who know more about our fire than we do [and] the very people trying to steal my husband[']s company?

(J.A. 207–08.)

23.    On 16 March 2024, Mrs. Brasser made a Facebook post concerning the criminal action against Mr. Brasser and Mr. Gentner:

Dr. Phil says lying by omission is still lying!

This entire case was a stacked deck of LIES!

[Mr. Brasser and Mr. Gentner] are the very first Americans in these circumstances to be facing a prison sentence.

Let me say that again, there is no other American with a paid back tax liability paid with penalties [and] interest way before indictment [and] 3 years before conviction. This was a very technical strict statute of the law that was applied to a victimless crime yet categorized as felonyx5 [sic]!!

For example, you, too, could go to prison for speeding down the highway. But have you heard of anyone who has pulled over, called in their violation and worked closely with law enforcement to pay for their misjudgment? The paid speeding ticket years before should be resolved and in rear view mirror, right?

Then consider it wasn't the state trooper that comes after you years later. It is a couple up in Richmond who reported you, not for speeding, but blatantly lied about 20 [w]ay more glamorous crimes. Please note it's a felony to lie to feds!! They basically told the prosecutor she'd have the case of her career getting the Madeoff [sic] of Charlotte!

So they sent the troops and put surveillance on our every move. I thought I had suddenly gone nuts as who in the world would care to watch me walk to my kid's bus stop?! It had to be my imagination. But soon I'd know truth is stranger than fiction, the feds were duped with all sorts of lies to include us hiding money overseas [and] although all the insane chase downs amounted to nothing, they could never dare to look where all the smoke was coming from. "Oh no, not her, she's the daughter of the federal reserve retiree[.]"

I am the one who has opened their Pandora's box! So far I've been ignored which is far better than murdered but I'm not stopping until I'm heard! I've told too many now as I've been contacting law enforcement since 2018 among countless other folks with all the hard evidence I have.

Despite me contacting [the] FBI several times since 2021, the laser has not moved its focus off us. And now all [t]hey are left with is an unprecedented [and] beyond petty conviction that warrants 1000 questions far more than it answers them.

First question:

Do you think prosecutors should be held to [the] equal standard of the law that the rest of us are?

(J.A. 303–04.)

## III. PROCEDURAL BACKGROUND

24. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

25. rFactr, Mr. Brasser, and Mr. Gentner filed the *First Amended Complaint* on 16 August 2018, (ECF No. 3), and the *Second Amended Complaint* on 25 October 2018, (ECF No. 16).

26. This matter was designated as a mandatory complex business case on 18 September 2018 and reassigned to the undersigned on 28 August 2024. (ECF Nos. 4, 253.)

27. Counterclaim Plaintiffs filed *The McDowells' Answer to Plaintiffs' Second Amended Complaint; and Counterclaims against rFactr, Inc., Richard Brasser, and Greg Gentner* on 27 November 2018. (ECF No. 18.)

28. The Court entered an order staying the case on 8 February 2023. (Consent Order Staying Litig., ECF No. 224 [Stay Order].) The Court stayed the case because Mr. Brasser and Mr. Gentner were criminally indicted in the United States District Court for the Western District of North Carolina. (Stay Order ¶ 2.) The Court lifted the stay on 24 April 2024. (ECF No. 233.)

29. Counterclaim Plaintiffs moved to amend their counterclaims on 9 May 2024. (ECF No. 237.) The Court granted the motion on 18 July 2024. (ECF No. 244.)

30.     Counterclaim Plaintiffs filed the *Defendants' Supplemental Counterclaim and Complaint* on 24 July 2024. (ECF No. 245 [Suppl. Countercl.]; J.A. 153–77.) Counterclaim Plaintiffs bring two claims for relief: (1) defamation per se against Mr. Brasser, (Suppl. Countercl. ¶¶ 97–119); and (2) defamation per se against Mrs. Brasser, (Suppl. Countercl. ¶¶ 120–43).

31.     Counterclaim Plaintiffs filed the Motion on 15 May 2025. (Mot. 2.) On 3 July 2025, (1) Counterclaim Plaintiffs filed their supporting brief, (Br. Supp. Mot., ECF No. 281 [Br. Supp.]); (2) Counterclaim Defendants filed their opposing brief, (Mem. Opp'n Mot., ECF No. 283 [Br. Opp'n]); (3) Counterclaim Plaintiffs filed their reply brief, (Reply Br. Supp. Mot., ECF No. 282 [Reply]); and (4) Counterclaim Plaintiffs and Counterclaim Defendants filed a joint appendix containing the exhibits relevant to the Motion, (*see* J.A.).

32.     The Motion has been fully briefed, and the Court held a hearing on the Motion on 21 August 2025, at which all parties were represented by counsel. (*See* ECF No. 284.)

33.     The Motion is ripe for resolution.

## IV.    LEGAL STANDARD

34.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "A genuine issue of material fact is one supported by evidence that would persuade a reasonable mind to

accept a conclusion." *N.C. Farm Bureau Mut. Ins. Co. v. Lanier L. Grp., P.A.*, 277 N.C. App. 605, 608–09 (2021) (citation modified). In ruling on a motion for summary judgment, "the Court views the evidence in the light most favorable to the nonmoving party and draws all inferences in its favor." *Water.io Ltd. v. Sealed Air Corp.*, 2025 NCBC LEXIS 119, at *2 (N.C. Super. Ct. Sep. 5, 2025) (citing *Vizant Techs., LLC v. YRC Worldwide, Inc.*, 373 N.C. 549, 556 (2020)).

35. Ordinarily, the moving party satisfies its burden "by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense . . . or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [its] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citation modified). The burden then shifts to the nonmoving party to "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *New Hanover Cnty. Bd. of Educ. v. Stein*, 374 N.C. 102, 115 (2020) (citation modified).

36. However, if a party moves for summary judgment on its own claims (affirmative summary judgment), it must meet a greater burden. *Mary Annette, LLC v. Crider*, 2023 NCBC LEXIS 126, at *4 (N.C. Super. Ct. Oct. 11, 2023); *Brooks v. Mount Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726, 728 (1980). The moving party "must show that there are no genuine issues of fact, that there are no gaps in [its] proof, that no inferences inconsistent with [its] recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985). Thus, "it is 'rarely . . . proper

to enter summary judgment in favor of the party having the burden of proof.' " *Compass Tax Servs. LLC v. Karki*, 2024 NCBC LEXIS 73, at \*25 (N.C. Super. Ct. May 20, 2024) (quoting *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984)).

## V.     ANALYSIS

37.     Counterclaim Plaintiffs seek affirmative summary judgment on their defamation per se claims against Counterclaim Defendants.   (Mot. 1–2.) Counterclaim Plaintiffs contend that Counterclaim Defendants' statements are defamatory in nature and that Counterclaim Defendants have not, through discovery, produced sufficient evidence to convince a reasonable person that these statements are substantially true or not about Counterclaim Plaintiffs.  (*See* Br. Supp. 10, 13–17.)  The Court addresses each argument in turn.[6]

### A.     **Defamatory**

38.     To recover for defamation, a plaintiff "must show that the defendant (1) caused injury to the plaintiff (2) by making false, defamatory statements (3) of or concerning the plaintiff (4) [that] were published to a third person." *Bouvier v. Porter*, 386 N.C. 1, 10 (2024) (citation modified).  Statements that are defamatory per se raise "a conclusive presumption of legal injury and general damage, entitling [the] plaintiff to recover nominal damages at least without specific allegations or proof of damages."

---

[6] Counterclaim Defendants assert that they are entitled to summary judgment on Counterclaim Plaintiffs' claims. (Br. Opp'n 7.)  The Court declines to consider this argument because Counterclaim Defendants did not file a corresponding motion and supporting brief by the deadline for post-discovery dispositive motions specified in the Court's *Case Management Order*.  (*See* ECF No. 265); *see also* N.C.G.S. § 1A-1, Rule 56(c) ("Summary judgment, when appropriate, *may* be rendered against the moving party." (emphasis added)).

*Gibson v. Mut. Life Ins. Co.*, 121 N.C. App. 284, 289 (1996) (quoting *Stewart v. Nation-Wide Check Corp.*, 279 N.C. 278, 284 (1971)).

39. "Libel is a written defamatory statement, and slander is an oral defamatory statement." *Bouvier*, 386 N.C. at 10 (citation omitted). Slander per se encompasses three types of oral statements: "(1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; [and] (3) an imputation that the plaintiff has a loathsome disease." *Dunn Holdings I, Inc. v. Confluent Health LLC*, 2018 NCBC LEXIS 215, at \*26 (N.C. Super. Ct. Dec. 10, 2018) (citing *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29–30 (2002)). A statement is libelous per se if it "(1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace." *Phillips v. Winston-Salem/Forsyth Cnty. Bd. of Educ.*, 117 N.C. App. 274, 277 (1994) (citation omitted); *Kingsdown, Inc. v. Hinshaw*, 2016 NCBC LEXIS 15, at \*35–36 (N.C. Super. Ct. Feb. 17, 2016).

40. To be defamatory per se, a statement "must be susceptible of but one meaning and of such nature that the [C]ourt can presume as a matter of law that [it] tend[s] to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." *Boyce*, 153 N.C. App. at 30–31 (citation omitted) (slander per se); *Skinner v. Reynolds*, 237 N.C. App. 150, 152–53 (2014) (libel per se). If a publication is susceptible of non-defamatory meaning, it

cannot support an action for defamation per se. *See Renwick v. News & Observer Publ'g Co.*, 310 N.C. 312, 320 (1984).

41. In determining whether a statement is defamatory per se, the Court must construe the statement from the perspective of an ordinary person. *See Taube v. Hooper*, 270 N.C. App. 604, 609 (2020). The Court must also construe the statement "stripped of all insinuations, innuendo, colloquium and explanatory circumstances." *Id.* at 609 (citation modified). In other words, "[t]he [statement] must be defamatory on its face 'within the four corners thereof.' " *Renwick*, 310 N.C. at 318–19; *see K&M Collision, LLC v. N.C. Farm Bureau Mut. Ins. Co.*, 2017 NCBC LEXIS 130, at *20 (N.C. Super. Ct. Oct. 9, 2017) ("Slander is not actionable *per se* '[w]here the injurious character of the words do[es] not appear on their face as a matter of general acceptance, but only in consequence of extrinsic, explanatory facts[.]' ").

42. Truth is a complete defense to defamation per se. *Demarco v. Charlotte-Mecklenburg Hosp. Auth.*, 268 N.C. App. 334, 344 (2019). A statement must only be "substantially true" to be considered truthful. *See Turpin v. Charlotte Latin Schs., Inc.*, 293 N.C. App. 330, 351 (2024). A statement is substantially true if its "gist or sting" is true, "even if minor details are not." *See id.* (citing *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 68 (2020)).

43. "If a statement cannot reasonably be interpreted as stating actual facts about an individual, it cannot be the subject of a defamation suit." *Craven v. SEIU COPE*, 188 N.C. App. 814, 817 (2008) (citation omitted); *SiteLink Software, LLC v. Red Nova Labs, Inc.*, 2018 NCBC LEXIS 90, at *55 (N.C. Super. Ct. Aug. 20, 2018).

A statement does not assert actual facts if it is "incapable of being actually or factually proven or disproven." *Craven*, 188 N.C. App. at 818; *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at *72 (N.C. Super. Ct. Oct. 21, 2016). "In determining whether a statement can be reasonably interpreted as stating actual facts about an individual, courts . . . . consider whether the language used is loose, figurative, or hyperbolic language, as well as the general tenor of the [statement]." *Craven*, 188 N.C. App. at 817 (quoting *Daniels v. Metro Mag. Holding Co., L.L.C.*, 179 N.C. App. 533, 539–40 (2006)).

### 1. Alleged Arson Accusations

44.    Counterclaim Plaintiffs argue Counterclaim Defendants' online posts are defamatory per se because they contain implicit accusations of arson, which Counterclaim Plaintiffs contend is a crime of moral turpitude and an infamous crime. (Br. Supp. 14–15.) Specifically, they argue that the following online posts contain allegations of arson regarding the 2016 fire at Counterclaim Defendants' home: (i) the Fundraiser, (J.A. 187–88 ("We are also in need of funding to reopen the investigation of our fire as we think the timing was precisely too perfect with bankruptcy motives and even their own words that our fire was intentional.")); (ii) Mrs. Brasser's comment on her 14 October 2023 Facebook post, (J.A. 179–82 ("Don't . . . let your babies be set on fire and let their dad go to jail for the real criminals' crimes.")); (iii) the "Brasser Family Justice" video, *Brasser Family Justice, supra* (stating that donations would go toward reopening the fire investigation to see if the Brasser family was "purposely put on fire"); (iv) one of Mrs. Brasser's comments on her

13 March 2024 Facebook post, (J.A. 203 ("Jurors would have known where all the smoke was coming from figuratively if not literally.")); and (v) the 15 March 2024 Facebook post, (J.A. 207–15 ("Who knew a prosecutor would take a case from the very people who know more about our fire than we do [and] the very people trying to steal my husband[']s company?")). (Br. Supp. 14–15; Reply 11.)

45. Counterclaim Defendants respond that the statements in the Fundraiser do not accuse anyone of arson, and that concluding otherwise would require the use of insinuations impermissible in evaluating a defamation per se claim. (Br. Opp'n 14.) Counterclaim Defendants instead construe the statements in the Fundraiser as expressing a desire to determine whether an arson occurred. (Br. Opp'n 15–16.) As to the 14 October 2023 Facebook post, Counterclaim Defendants argue that statement is too ambiguous to interpret it as an accusation of arson. (Br. Opp'n 16.)

46. The Court concludes that the alleged arson accusations are not defamatory per se. To be defamatory per se, a statement must be slanderous or libelous "on its face" and when "stripped of all insinuations." *Taube*, 270 N.C. App. at 609. Counterclaim Plaintiffs concede that the alleged accusations of arson are only implicit.[7] (Br. Supp. 15 ("While [Counterclaim Defendants] did not explicitly say '[Counterclaim Plaintiffs] committed arson,' their oral and written statements

---

[7] The Court gives no weight to the holding in *Eshelman v. Puma Biotechnology, Inc.* that a statement may be defamatory by implication. No. 7:16-CV-18-D, 2018 U.S. Dist. LEXIS 245812, at *6 (E.D.N.C. Oct. 29, 2018); (*see* Br. Supp. 15). *Eshelman* is not binding on this Court and contradicts the North Carolina Court of Appeals' holding in *Taube*. *See Taube*, 270 N.C. App. at 609 (to be defamatory per se, a statement must be defamatory "on its face" and when "stripped of all insinuations").

certainly imply an arson allegation."); Reply 10.) Accordingly, the Motion is **DENIED** to the extent it relies on Counterclaim Defendants' alleged accusations of arson.

### 2. Alleged Stalking Accusations

47. Counterclaim Plaintiffs argue that Counterclaim Defendants' online posts are defamatory per se because they contain accusations of stalking Counterclaim Defendants' children. Counterclaim Plaintiffs contend that stalking, particularly when done to a child, is a crime of moral turpitude and an infamous crime. (Br. Supp. 16–17.) Counterclaim Plaintiffs point to the following posts to support their position: (i) the "Brasser Family Justice" video, *Brasser Family Justice*, *supra*, at 12:06–12:30 ("[H]ow can perpetrators who stalk children . . . be getting things into a courtroom on a federal level[?]"); and (ii) Mrs. Brasser's 14 March 2024 Facebook post, (J.A. 205 ("Am I really to believe all my husband[']s failed contracts in [the] last hour of deal making is an isolated event to . . . the stalking of my children[?]")). (Br. Supp. 17.)

48. Counterclaim Defendants contend that an accusation of stalking is not defamatory per se because "stalking" has a criminal and non-criminal meaning. (Br. Opp'n 16–17.) Counterclaim Defendants also contend that, to the extent the stalking accusations relate to Counterclaim Plaintiffs, they are substantially true because Mrs. McDowell admitted to (1) consulting with a private investigator about surveilling Counterclaim Defendants and (2) using the social media posts of one of Counterclaim Defendants' children to determine the location of Counterclaim

Defendants' family.  (Br. Opp'n 16–17; J.A. 325 at 243:12–25; J.A. 340–43 at 299:6–302:20.)

49.     The Court ultimately agrees with Counterclaim Defendants.  An accusation that one stalks children arguably "tend[s] to subject one to ridicule, contempt or disgrace." *See Phillips*, 117 N.C. App. at 277; *Renwick*, 310 N.C. at 320.  Nonetheless, viewing the evidence in the light most favorable to Counterclaim Defendants, a reasonable juror could find that the stalking accusations do not subject Counterclaim Plaintiffs to ridicule or are substantially true.  Mrs. McDowell admitted to two behaviors that, from the perspective of an ordinary person, could reasonably but need not necessarily be understood to constitute stalking: (1) using social media to monitor the location of Counterclaim Defendants' family and (2) seeking a private investigator to surveil Counterclaim Defendants.  (*See* J.A. 340–43 at 299:6–302:20.)  As such, the Court cannot conclude that Counterclaim Defendants' alleged stalking accusations are defamatory as a matter of law.

50.     Accordingly, the Motion is **DENIED** to the extent it relies on Counterclaim Defendants' alleged accusations of stalking.

### 3.     Alleged Accusations of Craziness and Psychopathy

51.     Counterclaim Plaintiffs argue that Counterclaim Defendants' online posts are libelous per se because they deem Counterclaim Plaintiffs "crazy," "psychopathic," "predators," and "perpetrators" who "terrorized" Counterclaim Defendants.  (Br. Supp. 19–20; J.A. 188, 205; *Brasser Family Justice*, *supra*.)  Counterclaim Plaintiffs argue that these descriptors subject them to "ridicule or disgrace."  (Br. Supp. 19.)

52. Counterclaim Defendants contend that the above descriptors are non-actionable statements of opinion. (Br. Opp'n 17.) Alternatively, Counterclaim Defendants contend that these descriptors are substantially true or susceptible of non-defamatory meaning. (Br. Opp'n 17–18.)

53. The Court concludes that the statements are, or could be reasonably interpreted as, expressions of opinion such that summary adjudication is inappropriate. Whether an individual is "crazy" or a "predator" is not factually provable, and nowhere do Counterclaim Defendants' online posts discuss the diagnostic criteria for psychopathy. *See Plasman*, 2016 NCBC LEXIS 80, at \*71–72 (statement that plaintiff was "power hungry" was opinion or rhetorical hyperbole); *see also Fram v. Yellow Cab Co.*, 380 F. Supp. 1314, 1329–30 (W.D. Pa. 1974) (statement that plaintiff was "schizophrenic" was not defamatory because recipient would not understand statement to concern "actual psychological or mental affliction"). Further, any use of the term "perpetrators" in Counterclaim Defendants' posts is surrounded by non-provable descriptors, hyperbole, and speculative language. (*See* J.A. 188 ("What might have started off grounded in envy, grew into a psychopathic obsession to bring [Mr. Brasser] down."; "These are taxes that were delinquent because the crazy couple was sabotaging the company[.]"; "We also realize just how far this psychopathic couple will go[.]")); *see also Brasser Family Justice*, *supra* (calling its unnamed subjects "top-notch manipulators" and "predators [who] are capable of the unthinkable"). As such, a reasonable reader could conclude that the term "perpetrators" communicates an unfavorable opinion about its subjects'

character rather than a fact about its subjects' conduct. Additionally, Counterclaim Defendants' posts do not specify to what conduct the term "perpetrators" refers such that the accuracy of the term can be proven or disproven. *See, e.g., Brasser Family Justice, supra*, at 12:20–12:30 ("[H]ow can perpetrators who stalk children and call fire 'arson' be getting things into a courtroom on a federal level[?]").

54. As to the statement that unnamed individuals "terrorized" Counterclaim Defendants' family, it cannot be said that the term communicates actual facts because it necessarily implies a subjective emotional state. *See Terrorize*, Merriam-Webster, https://www.merriam-webster.com/dictionary/terrorize (last visited Sep. 29, 2025) (defining "terrorize" as "to fill with terror or anxiety"); *see also Harris v. Warner*, 527 P.3d 314, 319 (Ariz. 2023) (statement that another's conduct was "downright frightening" was not defamatory because it reflected a "subjective impression[]").

55. Thus, while "crazy," "psychopathic," "predator" and similar terms may have a negative connotation, a reasonable person could understand these to be non-provable, opinion-based representations of their target. Thus, the Court cannot conclude that the above descriptors are defamatory per se as a matter of law.

56. Accordingly, the Motion is **DENIED** to the extent it relies on Counterclaim Defendants' alleged accusations that Counterclaim Plaintiffs were "crazy," "psychopathic," "predators," or "perpetrators" who "terrorized" Counterclaim Defendants.

## 4. Alleged Accusations of Lying to Government Officials

57. Counterclaim Plaintiffs argue that Counterclaim Defendants committed libel per se by accusing Counterclaim Plaintiffs of an infamous crime: falsely reporting to government officials that Mr. Brasser and Mr. Gentner had committed various crimes. (*See* Br. Supp. 17.) Counterclaim Plaintiffs point to Mrs. Brasser's 16 March 2024 Facebook post. (Br. Supp. 17; J.A. 303 ("It is a couple up in Richmond who reported you, not for speeding, but blatantly lied about 20 [w]ay more glamourous crimes. Please note it's a felony to lie to feds!! They basically told the prosecutor she'd have the case of her career getting the Madeoff [sic] of Charlotte!").)

58. Counterclaim Defendants do not address this argument in their response brief. (*See* Br. Opp'n.) Nonetheless, considering the text of the Facebook post as a whole, the Court concludes there is sufficient evidence that the post is non-factual in nature to preclude summary adjudication.

59. In *Daniels v. Metro Magazine Holding Co., LLC*, the Court of Appeals considered a libel claim arising out of an article the defendant wrote and published. 179 N.C. App. 533. The article described the processing of the defendant's car insurance claim. *Id.* at 534–38, 540. In pertinent part, the article stated that the plaintiff-insurance adjuster (i) falsely accused the defendant of stealing his own car, (ii) acted comparably to the "Soviet security police," (iii) spoke in a sinister "Gestapo" voice, and (iv) was a fascist. *Id.*

60. The Court found that the last three statements were non-actionable opinions or hyperbole because they were incapable of being proven, disproven, or

taken literally by a reasonable reader. *Id.* at 541. The Court acknowledged that the defendant's first statement "provide[d] slightly stronger support" for the plaintiff's libel claim. *Id.* at 541. Nonetheless, considering the article as a whole, the Court found that this statement was a non-actionable expression of outrage. *See id.* at 541–42. Specifically, the Court found that this statement formed part of a "highly individualized, personal interpretation" of the insurance claim process "tainted by [the defendant's] own emotions, rather than a journalistic, factual recounting of events." *Id.* at 541. In reaching this determination, the Court emphasized that the defendant's article was "absurd," "obviously disgruntled," and indignant in tone. *See id.* at 541–42. As such, the article's credibility was questionable, and a reasonable reader would interpret the article as an expression of outrage rather than a statement of fact. *See id.* Therefore, the Court held the article could not support a libel per se claim. *Id.* at 542.

61. The Court concludes that the same reasoning applies to the 16 March 2024 Facebook post. The punctuation and language used in the post reveal its disgruntled and indignant tone. (J.A. 303 ("This entire case was a stacked deck of LIES!"; "Please note it's a felony to lie to feds!!").) Additionally, the post employs figurative, qualifying, and arguably hyperbolic language. (J.A. 303 ("[Mr. Brasser and Mr. Gentner] are the very first Americans in these circumstances to be facing a prison sentence."; "They basically told the prosecutor she'd have the case of her career getting the Madeoff [sic] of Charlotte!"; "I am the one who has opened their Pandora's box!"; "[T]he feds . . . could never dare to look where all the smoke was coming

from.").) Such language casts doubt on whether the post is a factual representation of the criminal action against Mr. Brasser or a "highly individualized, personal interpretation . . . tainted by [the author's] own emotions." *See Daniels*, 179 N.C. App. at 541. As such, an ordinary reader could perceive the post as containing non-actionable expressions of outrage rather than factual assertions. *See id.* at 542. Therefore, it cannot be said as a matter of law that the 16 March 2024 Facebook post is defamatory per se.

62. Accordingly, the Court **DENIES** the Motion to the extent it asserts the 16 March 2024 Facebook post is defamatory per se.

### 5. Alleged Accusations of Financial Crimes

63. Counterclaim Plaintiffs argue that Counterclaim Defendants' online posts are libelous per se because they accuse Counterclaim Plaintiffs of securities fraud and other financial crimes, which they argue constitutes an impeachment of Mr. McDowell as a financial professional. (Br. Supp. 17–19.) Counterclaim Plaintiffs point to the following posts: (i) the Fundraiser, (J.A. 188 (stating that an unnamed investor had engaged in conduct constituting "securities fraud," and that such fraud was "an existential and criminal problem since [the investor was] a Wall Street bond trader")); and (ii) Mrs. Brasser's 13 March 2024 Facebook post, which Mr. Brasser shared, (J.A. 196 ("Why did the IRS . . . hide MR and MRS Richmond's own tax crimes and much more serious crime of security fraud?"; "By the way, why has Mr

Richmond not reported his numerous lawsuits for security fraud and false tax returns to FINRA? It is required by law if you are a wall street trader.")). (Br. Supp. 17–19.)[8]

64. Counterclaim Defendants contend that, assuming Counterclaim Plaintiffs contest the accusations of securities fraud, there is a genuine issue of material fact as to (1) whether Mr. McDowell received compensation for introducing investors to rFactr and failed to disclose such compensation and (2) whether such conduct violates any ethical duty Mr. McDowell owed to rFactr's investors. (Br. Opp'n 18–19.) They point to Mr. Brasser's deposition testimony that Mr. McDowell was compensated with rFactr stock for introducing new investors to the company and failed to disclose this compensation to the investors. (Br. Opp'n 18; J.A. 347–49.)

65. The determination of whether Mr. McDowell breached any ethical duties or violated securities law is not within the purview of the Court. However, the Court may properly decide whether the online posts at issue contain defamatory statements.

66. To impeach a plaintiff in his trade, the alleged defamatory statement must "touch the plaintiff in his special trade or occupation, and must contain an imputation necessarily hurtful in its effect on his business." *SiteLink*, 2018 NCBC LEXIS 90,

---

[8] Counterclaim Plaintiffs contend in passing that Counterclaim Defendants "mischaracterize" the civil lawsuit against Counterclaim Plaintiffs as a criminal action. (Br. Supp. 19.) This allegation appears to relate to Mrs. Brasser's 13 March 2024 Facebook post. (J.A. 196.) Because that post refers to the action against Counterclaim Plaintiffs as a "lawsuit," the Court cannot conclude as a matter of law that the post misrepresents the instant case as a criminal action. *See Lawsuit*, The Law Dictionary, https://thelawdictionary.org/lawsuit/ (last visited Sep. 30, 2025) (defining "lawsuit" as an action "instituted . . . between two private persons"); *Lawsuits,* N.C. Jud. Branch, https://www.nccourts.gov/help-topics/lawsuits-and-small-claims/lawsuits (last visited Sep. 30, 2025) ("Lawsuits are civil, not criminal[.]").

at *55 (quoting *Badame v. Lampke*, 242 N.C. 755, 757 (1955)). "Defamation of this class ordinarily includes charges made by one trader or merchant tending to degrade a rival by charging him with dishonorable conduct in business." *Id.* (citation omitted). As with all allegedly defamatory statements, a statement that purportedly impeaches another in their trade cannot be defamatory per se if it "cannot reasonably [be] interpreted as stating actual facts about an individual[.]" *Daniels*, 179 N.C. App. at 539 (citation modified).

67. The Court cannot conclude as a matter of law that the Fundraiser and 13 March 2024 Facebook post contain defamatory accusations of securities fraud or other financial misconduct. Considered in its entirety, the Fundraiser contains expressions of opinion and hyperbolic language that undermine the factuality of its assertions. For instance, the Fundraiser states that its unnamed subjects had a "psychopathic obsession to bring [Mr. Brasser] down," and that such obsession "might have started off grounded in envy." (J.A. 188.) Further, the Fundraiser calls its subjects "crazy" and "psychopathic"; describes the criminal action against Mr. Brasser as "unlike any case in the history of the United States"; and states that "[w]hat is happening is just plain wrong and evil[.]" (J.A. 188.) These statements are incapable of being proven or disproven, are hyperbolic, or are tonally indignant such that the ordinary reader could interpret them as expressions of outrage. While the Fundraiser's accusation that one of its subjects committed securities fraud "arguably provides slightly stronger support" for Counterclaim Plaintiffs' defamation claims, this accusation merely forms part of a "highly individualized, personal interpretation"

of the events surrounding the case at bar. *See Daniels*, 179 N.C. App. at 541–42. Thus, the Court cannot conclude that the Fundraiser's accusation of securities fraud is defamatory as a matter of law.

68. The Court reaches the same conclusion as to the 13 March 2024 Facebook post. The post's disgruntled and indignant tone is clear from its use of emphasizing punctuation and deriding language. (J.A. 195–99.) For instance, the post describes the criminal action against Mr. Brasser as a "circus show," "WITCH HUNT," "wild goose chase," and "MOCKERY" of the justice system. (J.A. 195–96, 199.) The post also contains a non-provable opinion that the "IRS SELF DISCLOSURE PROGRAM . . . . is a Bait and Switch!!!!" (J.A. 197.) Even further, the post is arguably hyperbolic in its assertions that Mr. Brasser is "the first American Man ever convicted in these circumstances," and that "[t]here is no other such case in [the] history of [the] United States!!!" (J.A. 197–98.)

69. Thus, an ordinary reader could understand the 13 March 2024 Facebook post to be a "highly individualized, personal interpretation" of the events surrounding the criminal action against Mr. Brasser, rather than a "factual recounting of events." *See Daniels*, 179 N.C. App. at 541. The Court, therefore, cannot conclude that the post's accusations of securities fraud and other financial crimes are defamatory as a matter of law.

70. Accordingly, the Motion is **DENIED** to the extent it asserts Counterclaim Defendants' posts contain defamatory accusations of financial crimes.

71.     Having found that it cannot conclude Counterclaim Defendants' posts are defamatory per se as a matter of law, the Court turns to whether such posts are "of or concerning" Counterclaim Plaintiffs.[9]

**B.      Of or Concerning Counterclaim Plaintiffs**

72.     Notwithstanding the Court's lengthy analysis of the defamatory nature of the statements at issue, the Court further concludes that there is a separate, additional reason that affirmative summary judgment may not properly be granted for Counterclaim Plaintiffs.  "In order for defamatory words to be actionable, they must refer to some ascertained or ascertainable person and that person must be the plaintiff.  If the words used contain no reflection on any particular individual, no averment can make them dafamatory [sic]."  *Taube*, 270 N.C. App. at 609 (quoting *Arnold v. Sharpe*, 296 N.C. 533, 539 (1979)).  Whether a plaintiff is ascertainable from a defamatory statement is evaluated from the perspective of an ordinary person.  *Id.* ("The question always is how would ordinary men naturally understand the [statement.]"); *see Renwick*, 310 N.C. at 319 ("The editorial giving rise to this appeal when viewed 'within the four corners thereof' and as ordinary people would understand it simply is not directed toward the plaintiff.").

73.     Counterclaim Plaintiffs argue that, taken together, the statements in the Fundraiser, Mrs. Brassers' YouTube videos, and Counterclaim Defendants' Facebook posts render Counterclaim Plaintiffs readily ascertainable as the objects of the

---

[9] The Court notes that Counterclaim Plaintiffs do not contend that the "Mr and Mrs ManCode" and "False Accusation #1" videos contain defamatory statements. (*See generally* Suppl. Countercl.)

alleged defamatory statements by an ordinary reader. (Br. Supp. 11.) To support their argument, Counterclaim Plaintiffs contend that Counterclaim Defendants' statements all concern the same two subjects and reveal significant information about those subjects. (Br. Supp. 11–12.) Such information includes that (i) the subjects are a husband and wife, both of whom Counterclaim Defendants had sued, (J.A. 187–88, 196); (ii) the subjects lived in Richmond, Virginia, (J.A. 193–96, 203, 303); and (iii) the husband, whose name is Chris, had invested in Mr. Brasser's company and was a Wall Street bond trader. (J.A. 187–88, 196; *Mr & Mrs ManCode*, *supra*.)

74. Counterclaim Defendants argue that, because Counterclaim Plaintiffs' claims are for defamation per se, the Fundraiser and each social media post must be considered separately when determining whether they render Counterclaim Plaintiffs ascertainable. (Br. Opp'n 8–9.) They then contend that the Fundraiser and Facebook posts, considered individually, do not contain enough information to render Counterclaim Plaintiffs ascertainable. (Br. Opp'n 8–12.) For instance, they agree that the Fundraiser indicates that (i) its unnamed subjects were a husband and wife, (ii) the husband was a Wall Street bond trader, (iii) the husband had invested in Mr. Brasser's company, and (iv) Counterclaim Defendants had filed a civil suit against the husband and wife. (Br. Opp'n 9–10.) However, they argue that an ordinary person reading this information would not understand the statements to concern Counterclaim Plaintiffs, particularly because the Fundraiser does not expressly mention rFactr. (Br. Opp'n 9–12.)

75. Counterclaim Plaintiffs respond that Counterclaim Defendants misconstrue the "ascertainable" standard. (Reply 6.) They argue that the standard is not whether, without extrinsic sources, an ordinary reader would be able to ascertain the identity of a person described in a statement. (*See* Reply 6.) Instead, they argue that the standard is whether an ordinary reader could "use" the information in the statement to identify the person the statement concerns. (Reply 6–7.) Further, they argue that the Fundraiser, each Facebook post, and each YouTube video contain enough information to identify Counterclaim Plaintiffs even when considered individually. (Reply 7–10.) Nonetheless, Counterclaim Plaintiffs also contend that the 13, 14, 15, and 16 March 2024 Facebook posts should be considered as one post because they were made successively. (Reply 8.)

76. The following two cases are instructive on the question of whether a statement is "of or concerning" a plaintiff: *Taube v. Hooper*, 270 N.C. App. 604, and *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25.

77. In *Taube*, a police officer sued a police chief for defamation per se in connection with the former's investigation of an excessive force incident. *Taube*, 270 N.C. App. at 605. On the night the incident occurred, the police officer was the "supervisor on duty" and therefore responsible for investigating the incident in accordance with certain procedures. *Id.* at 606–07. In responding to public outcry related to the incident, the police chief told local press that " 'the [s]upervisor who showed up to review' [the incident] . . . failed to follow the department's reporting policy" and was subsequently disciplined. *Id.* Local media outlets later identified the

plaintiff as the supervisor. *Id.* at 610. In reaching its conclusion, the Court of Appeals noted that it was limited to considering the language in the "four corners" of the statement. *See id.* at 609–10. As such, it was irrelevant that local media outlets had ascertained the plaintiff's identity. *Id.* at 610. The Court of Appeals concluded that the police chief's statement did not sufficiently identify the plaintiff because it merely referred "to the one 'supervisor,' of which there [were] many in the [d]epartment." *Id.* at 611.

78. In *Boyce*, the law firm Boyce & Isley, PLLC and its four member attorneys sued over a political advertisement accusing "Dan Boyce's law firm" of unethical conduct. 153 N.C. App. at 26–30. The Court of Appeals found that the advertisement sufficiently identified each attorney in the firm because it referred to "a small group or class of persons in its entirety," and an ordinary person could ascertain that "Dan Boyce's law firm" referred to the attorneys of Boyce & Isley, PLLC. *Id.* at 26, 33. In contrasting its decision with prior case law, the Court of Appeals noted that a statement "accusing 'someone' in a group of [numerous] persons of misconduct will not support an action for defamation by a member of that group." *Id.* at 33.

79. The Court agrees with Counterclaim Defendants that each online post must be considered separately in determining whether it renders Counterclaim Plaintiffs ascertainable.[10] *Taube*, 270 N.C. App. at 609 (stating that courts must construe

---

[10] North Carolina courts have not addressed whether successive Facebook posts should be considered one post in evaluating a defamation per se claim. However, in light of the Court's holding in *Taube*, the Court sees no reason for considering the March Facebook posts together. *See Taube*, 270 N.C. App. at 609; *see also Todd v. Lovecruft*, Case No. 19-cv-01751-DMR, 2020 U.S. Dist. LEXIS 2309, at *51–54 (N.D. Cal. Jan. 6, 2020) (considering separately

allegedly defamatory statements within their "four corners"). The Court addresses each of Counterclaim Defendants' online posts in turn.

### 1. The Fundraiser

80. The Court concludes that the statements in the Fundraiser are sufficiently distinguishable from those in *Taube* and *Boyce* such that it cannot conclude, as a matter of law, that they render Counterclaim Plaintiffs ascertainable.

81. While *Taube* and the present case both involve statements about specific, unnamed individuals, the plaintiff in *Taube* was only identified by her position and participation in a particular event. *See Taube*, 270 N.C. App. at 607–09. Here, the Fundraiser provides one of its subjects' marital status, occupation, and prior business relationship with Mr. Brasser. (J.A. 188.) Additionally, the Fundraiser accuses its unnamed subjects of sabotaging "[Mr. Brasser's] company" and states that such subjects had been sued by Counterclaim Defendants. (J.A. 188.) Similarly, although *Boyce* and the present case both involve statements that purportedly malign multiple individuals, the Fundraiser does not use any name by which its subjects could be readily identified as a matter of law. *See Boyce*, 153 N.C. App. at 26–30; (J.A. 188). For instance, the Fundraiser does not name its subjects, nor does it name their places of work. *See Boyce*, 153 N.C. App. at 26, 33; *see also Kingsdown*, 2016 NCBC LEXIS 15, at *39 ("[Counterclaim plaintiff's] name does not appear anywhere in the article at issue. The average person would necessarily require additional information

---

tweets whose "temporal proximity . . . would not be obvious to an average user unless they specifically looked at [the defendant's] Twitter page"); *Murray v. Pronto Installations, Inc.*, CASE NO.: 8:20-cr-824-T-24AEP, 2020 U.S. Dist. LEXIS 213494, at *7 (M.D. Fla. Nov. 16, 2020) (considering separately three Facebook posts made within one hour of each other).

to know that [counterclaim plaintiff] is among [those] mentioned in the article, a further fatal deficiency in [her] claims for libel per se or slander per se.").

82.     Accordingly, the Motion is **DENIED** to the extent it asserts the Fundraiser renders Counterclaim Plaintiffs readily ascertainable.

### 2.     14 October 2023 Facebook Post and "Brasser Family Justice" Video

83.     As a preliminary matter, the Court considers the 14 October 2023 Facebook post and the "Brasser Family Justice" video (together, the 14 October Post) to be one post for purposes of its analysis.  The Court may properly consider these items to be part of the "four corners" of one post because the video is embedded in the Facebook post.  *Cf. Taube*, 270 N.C. App. at 609 ("The [statement] must be defamatory on its face within the four corners thereof."); *cf. Renwick*, 310 N.C. at 318–19 (same); (J.A. 179–80).

84.     The Court concludes that Counterclaim Plaintiffs have not met their burden of establishing that, as a matter of law, the 14 October Post is "of or concerning" them.  *See Bouvier*, 386 N.C. at 10.  The text portion of the post contains no information about an unnamed couple.  It merely contains a request to share the post.  (J.A. 179.)  The comment Mrs. Brasser left on the post merely states that "bullies" want to steal Mr. Brasser's invention.  (J.A. 181.)  The video portion of the post only adds that its subjects are "up in Richmond."  *Brasser Family Justice, supra.*  Thus, at best, the 14 October Post only reveals that its subjects live in "Richmond" and have some connection to Mr. Brasser.  From the perspective of an ordinary

person, this information alone cannot as a matter of law be said to "contain [a] reflection on any particular individual." *Taube*, 270 N.C. App. at 609.[11]

85.     Accordingly, the Motion is **DENIED** to the extent it asserts the 14 October Post, and its component posts individually, render Counterclaim Plaintiffs readily ascertainable.

### 3.     "False Accusation #1" Video

86.     The Court concludes that Counterclaim Plaintiffs have not met their burden of establishing the "False Accusation #1" video renders them readily ascertainable as a matter of law.  The only information that video provides about its subject, an unnamed woman, is that she "lives up in Richmond [and] lived in Charlotte until 2013." *False Accusation #1*, *supra*, at 06:03–06:54.  It cannot be said that, as a matter of law, an ordinary reader would be able to identify Counterclaim Plaintiffs from such general information.  *See Taube*, 270 N.C. App. at 609.

87.     Accordingly, the Motion is **DENIED** to the extent it asserts the "False Accusation #1" video renders Counterclaim Plaintiffs readily ascertainable.

### 4.     "Mr & Mrs ManCode" Video

88.     The Court concludes that Counterclaim Plaintiffs have not met their burden of establishing the "Mr & Mrs ManCode" video renders them readily

---

[11] The Court notes that the Fundraiser is linked in the 14 October 2023 Facebook post, (J.A. 179), but it does not reach the question of whether items linked within a post are considered part of the post's four corners.  Nonetheless, even if the Court were to consider the Fundraiser alongside the 14 October Post, the result would be the same.  While, together, these online posts would contain more information than the defendant's statement in *Taube*, these posts would still lack the specificity of the statement at issue in *Boyce*.  *See Taube*, 270 N.C. App. at 607–09; *Boyce*, 153 N.C. App. at 26–30.

ascertainable as a matter of law. That video merely states that its subjects are an individual named "Chris" and his partner, both of whom were "up in Richmond." *Mr & Mrs ManCode, supra.* It cannot be said, as a matter of law, that an ordinary reader would identify Counterclaim Plaintiffs knowing only that the post concerns "Chris," a relatively common name, who is with his partner "up in Richmond," an otherwise undescribed location. *See Taube*, 270 N.C. App. at 609.

89. Accordingly, the Motion is **DENIED** to the extent it asserts the "Mr & Mrs ManCode" video renders Counterclaim Plaintiffs readily ascertainable.

### 5. The 13 March 2024 Facebook Post

90. The Court concludes that Counterclaim Plaintiffs have not met their burden of establishing the 13 March 2024 Facebook post renders them readily ascertainable as a matter of law.

91. The 13 March 2024 Facebook post contains an amount of identifying information comparable to the Fundraiser. Both state that their subjects are a couple and that the husband of such couple was a Wall Street trader who had engaged in securities fraud. (J.A. 188, 196.) Further, the 13 March Facebook 2024 post and the Fundraiser both accuse their subjects of "sabotag[ing]" a company and note the existence of a related lawsuit. (J.A. 188, 196.) Additionally, although the 13 March 2024 Facebook post does not identify the specific nature of the subject-husband's business relationship with Mr. Brasser, it contains two additional pieces of identifying information: it names rFactr as the company the subject couple

purportedly sabotaged and uses the pseudonym "Mr. and Mrs. Richmond" to refer to such couple. (J.A. 196.)

92. Nonetheless, the Court cannot say that any additional information in the 13 March 2024 Facebook post renders Counterclaim Plaintiffs ascertainable as a matter of law. On its face, the 13 March 2024 Facebook post does not indicate whether "Richmond" denotes a location and, even if it did, the post does not indicate what relationship the subject couple has to such location. Further, the explicit mention of rFactr falls short of naming the subject couple or their place of employment. Thus, while the 13 March 2024 Facebook post contains arguably more information than was offered by the defendant's statement in *Taube*, such information is not so explicit as the information offered by the defendant's statement in *Boyce*. *See Taube*, 270 N.C. App. at 607–09; *Boyce*, 153 N.C. App. at 26–30. Therefore, the Court cannot say, as a matter of law, that an ordinary reader of the post could readily ascertain Counterclaim Plaintiffs' identities.

93. Accordingly, the Court **DENIES** the Motion to the extent it asserts the 13 March 2024 Facebook post renders Counterclaim Plaintiffs readily ascertainable.

### 6. The 14 March 2024 Facebook Post

94. The Court concludes that Counterclaim Plaintiffs have not met their burden of establishing the 14 March 2024 Facebook post is "of or concerning" them. *See Bouvier*, 386 N.C. at 10. That post merely calls its subjects "Richmond couple" and accuses such couple of "illegally sabotaging [Mr. Brasser's] huge company deals." (J.A. 205.) At best, this post indicates that the subject couple has some relationship

with Mr. Brasser and "Richmond"—and that post does not reveal what or where "Richmond" is.

95. Accordingly, the Court **DENIES** the Motion to the extent it asserts the 14 March 2024 Facebook post concerns Counterclaim Plaintiffs.

### 7. The 15 March 2024 Facebook Post

96. The Court concludes that Counterclaim Plaintiffs have not met their burden of establishing the 15 March 2024 Facebook post concerns them. The only piece of arguably identifying information that post contains is within the following statement: "Who knew a prosecutor would take a case from the very people who know more about our fire than we do [and] the very people trying to steal my husband[']s company?" (J.A. 207.) This is decidedly less information than the 13 and 14 March 2024 Facebook posts contained. That the post's undescribed subjects purportedly want Mr. Brasser's company and have some knowledge about the fire at Counterclaim Defendants' home cannot be said to "contain [a] reflection on any particular individual." *Taube*, 270 N.C. App. at 609.

97. Accordingly, the Court **DENIES** the Motion to the extent it asserts the 15 March 2024 Facebook post concerns Counterclaim Plaintiffs.

### 8. The 16 March 2024 Facebook Post

98. The Court concludes that Counterclaim Plaintiffs have not met their burden of establishing the 16 March 2024 Facebook post concerns them. The post only identifies its subjects as a "couple up in Richmond," with the wife of such couple being "the daughter of a federal reserve retiree[.]" (J.A. 303.) Such information is

scant and less than that communicated by the defendant's statement in *Taube*, which identified the plaintiff by her position and participation in a particular event. *See Taube*, 270 N.C. App. at 607–09. It cannot be said that, as a matter of law, an ordinary person would determine that the post's subjects are Counterclaim Plaintiffs knowing only that such subjects are married, that they live in "Richmond," and that one of their fathers worked for the federal government. Such information could conceivably refer to several individuals.

99. Accordingly, the Court **DENIES** the Motion to the extent it asserts the 16 March 2024 Facebook post concerns Counterclaim Plaintiffs.

## VI. CONCLUSION

100. Counterclaim Plaintiffs have not met their burden of establishing, as a matter of law, that Counterclaim Defendants' posts are defamatory in nature or of or concerning Counterclaim Plaintiffs.

101. For the foregoing reasons, the Court hereby **DENIES** the Motion in full.

**IT IS SO ORDERED**, this the 16th day of October, 2025.

/s/ Michael L. Robinson
Michael L. Robinson
Chief Business Court Judge